394 So.2d 736 (1981)
Joseph LUTE, Jr., Plaintiff-Appellee,
v.
The CITY OF LAKE CHARLES, Belafonte Insurance, and William J. Rogers et al., Defendants-Appellants.
No. 8039.
Court of Appeal of Louisiana, Third Circuit.
February 4, 1981.
*737 Raggio, Cappel, Chozen & Berniard, Stephen A. Berniard, Jr., Lake Charles, for defendants-appellants.
Francis E. Mire, Lake Charles, for intervenor-appellee.
McClain, Morgan & Greenwald, Joseph W. Greenwald, Lake Charles, for plaintiff-appellee.
Woodley, Barnett, Cox, Williams & Fenet, Robert W. Fenet, Lake Charles, for defendant-appellee.
Before DOMENGEAUX, STOKER and LABORDE, JJ.
DOMENGEAUX, Judge.
At the age of fifty-one Joseph Lute, Jr. (hereinafter referred to as Lute) was employed by Pendleton Guard and Security Service, Inc. (hereinafter referred to as Pendleton) as a security guard working a forty-hour week. The initial date of his employment was November 30, 1977. He was assigned to work at the plant of Hercules, Inc. in Lake Charles, Louisiana.
As part of its services provided to Hercules, Pendleton's employees would use Hercules' vehicles to take Hercules' employees home if the latter were without transportation. In the early morning hours of January 21, 1978, Lute had performed such a service, delivering a Hercules employee to his personal vehicle in the Oak Park area of Lake Charles. Within minutes thereafter, as he was returning to the Hercules plant, the southbound 1975 Ford owned by Hercules and being driven by Lute was struck by an eastbound 1975 Dodge truck being driven by its owner, William J. Rogers (hereinafter referred to as Rogers) at the intersection of Eighteenth Street and Fifth Avenue in Lake Charles. The collision was caused by Rogers' disregard of a stop sign facing him on Eighteenth Street at the intersection.
Lute suffered a fractured cervical spine in the accident. His injury required extensive medical treatment, hospitalization and several surgical procedures.
On January 10, 1979, Lute instituted suit for his injuries and damages, naming the City of Lake Charles and its insurer, Belafonte *738 Insurance Company, and Rogers as defendants. On January 16, 1979, Continental Insurance Company (hereinafter referred to as Continental) filed a petition of intervention for weekly benefits and medical expenses it has paid as the workmen's compensation carrier for Lute's employer, Pendleton.
On January 19, 1979, Lute filed a supplemental and amending petition naming Aetna Life & Casualty Company (hereinafter referred to as Aetna) as a party defendant, alleging that company provided underinsured motorist coverage on the Hercules vehicle being driven by Lute.
Subsequent thereto, Aetna filed a third party demand against Pendleton and its insurer, Continental, alleging that a contract between Hercules and Pendleton required Pendleton to indemnify Aetna for the full amount of any judgment that might be rendered against Aetna in favor of Lute.
By April 14, 1980, the day of trial, Aetna was the only defendant remaining in the main demand; three other defendants, the City of Lake Charles, Belafonte Insurance Company, and Jerome Southerland, had been released outright, and the tort-feasor, Rogers, and his insurer, Dairyland Insurance Company, had settled with Lute for Dairyland's policy limits of $5,000.00.
At the conclusion of the trial on April 16, 1980, the jury awarded Lute the sum of $693,750.00 for his injuries and damages. The third party demand of Aetna and the intervention of Continental were taken under advisement by the trial judge.
On May 14, 1980, the trial judge issued written reasons holding that Aetna was entitled to judgment in the amount of $50,-000.00 on its third party demand against Pendleton and Continental, and that Continental's recovery on its intervention would be limited to $5,000.00, or the proceeds of the policy coverage afforded Rogers by Dairyland. A formal judgment incorporating the decisions of the trial judge and the jury was signed on June 4, 1980. An order for appeal of that judgment was filed by Aetna on June 13, 1980.
On appeal, Aetna argues (1) that the jury award to plaintiff of $693,750.00 is excessive; (2) that it is entitled to indemnification from Pendleton and Continental in the full amount of the judgment rendered in favor of Lute; and (3) the trial court erred in failing to render judgment in favor of Aetna and against Pendleton and Continental in an amount of not less than $56,190.00.
Pendleton and Continental have answered Aetna's appeal and argue that Aetna enjoys no right of indemnification against them. Pendleton and Continental urge therefore that the trial court erred in granting judgment in favor of Aetna and against them in the amount of $50,000.00. Further, Pendleton and Continental argue that the trial court erred in refusing their claim for reimbursement against Aetna for workmen's compensation benefits and medical expenses paid to plaintiff.
Plaintiff, Lute, opposes Aetna's claim that the award is excessive and Pendleton and Continental's claim that they should be reimbursed by Aetna from the proceeds of his award for workmen's compensation benefits and medical expenses paid by them to plaintiff.
We will discuss these issues in the following order:
(1) Is the jury award excessive?;
(2) Is Aetna entitled to indemnification from Pendleton and Continental?; and
(3) Are Pendleton and Continental entitled to recover from Aetna for workmen's compensation benefits and medical expenses paid to plaintiff?
I. IS THE JURY AWARD EXCESSIVE?
The jury awarded plaintiff $693,750.00. The award was not itemized so we do not know how much of the award is attributable to special damages and how much is attributable to general damages intended to compensate the plaintiff for pain and other damages which may not be calculated with precision.
The record establishes that plaintiff lost $23,467.16 in wages from January 21, *739 1978 (which was the date of the injury) to April 14, 1980, the beginning of trial. Also, his medical bills to the date of trial totalled $20,802.04. Thus, the jury must have awarded plaintiff the balance, $649,480.80, for loss of future wages and general damages, including future medical expenses and past and future pain and suffering.
The court recognized Dr. John W. Chisholm, a retired economics professor, as an expert economic consultant. Dr. Chisholm testified that his job is to take the work life expectancy of an individual who has been injured or killed, the occupation of that individual, and the wages of that individual, and to project the wages into the future upon certain assumptions, and then to discount them back to present value.[1]
Dr. Chisholm calculated the undiscounted value of plaintiff's lost wages, from April 14, 1980, through December 31, 1991 (when plaintiff will be 65 years old), to be $206,-235.05. He arrived at this figure by using plaintiff's gross annual income of $10,642.08 (based on plaintiff's monthly salary of $886.84). To this gross annual salary, Dr. Chisholm added 8.6% each year. Of this amount, 2.6% represented the average annual increase in productivity in the United States derived from figures published by the Department of Labor. The remaining 6% annual increase represented the inflation factor, which Dr. Chisholm acknowledged was a conservative figure, since the annual rate of inflation at trial exceeded 13%.[2]
Then, Dr. Chisholm discounted the value of plaintiff's lost wages of $206,235.05 to $144,830.32 by assuming that this amount was invested on April 14, 1980, and yielded 5% annually. As an alternative, he also calculated the discounted value of plaintiff's lost wages based on an annual investment yield of 7% to be $127,298.65.
Aetna argues that Dr. Chisholm should have used plaintiff's net wages, rather than his gross wages, to determine his loss of future income. The Supreme Court has observed that the future loss of earnings cannot be calculated with absolute certainty; these damages are somewhat speculative in nature. Robinson v. Graves, 343 So.2d 147 (La.1977); Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). Accordingly, there is no "right" formula for establishing the loss. While net wages are sometimes used, the use of gross income is also appropriate. Duplechin v. Pittsburgh Plate Glass Company, 265 So.2d 787 (La.App. 3rd Cir. 1972); Greene v. Wright, 365 So.2d 551 (La.App. 1st Cir. 1978). We note also that Aetna did not call an expert to rebut the manner in which Dr. Chisholm calculated plaintiff's future wage loss, nor was any other method used.[3]
Aetna contends that the jury awarded plaintiff the sum of $250,000.00 as compensation for his future wage loss. Such a contention is sheer speculation on Aetna's part since the jury's award was not itemized. We believe the jury probably awarded Dr. Chisholm's highest discounted figure of $144,830.32 for this loss.[4] However, we *740 find that even if the jury awarded plaintiff the amount of $127,298.65, Dr. Chisholm's lowest discounted figure, it still would not have abused its discretion in awarding plaintiff the balance of $522,182.15 in general damages to compensate the plaintiff, Joseph Lute, for his permanent disability and for the pain and suffering he has endured since the accident, and which he will continue to suffer for the rest of his life. The brief filed on behalf of Aetna, the defendant that is trying to diminish plaintiff's award, contains an excellent account of the plaintiff's injuries and extensive medical care, and we quote it at length:
"As a result of the collision, Lute sustained an injury to his cervical spine. He was taken to Lake Charles Memorial Hospital and admitted by Dr. William G. Akins, Jr., an orthopedic surgeon. Lute was seen in consultation by Dr. Gerald Litel, a neurosurgeon practicing in Lake Charles, and a diagnosis was made of a broken neck, or specifically, a fracture located at the C4, 5 level with scattered, diffuse nerve damage.
A Barton Tong Brace was attached to Lute's skull in order to effect traction at the point of the fracture. Lute remained at Lake Charles Memorial Hospital under such traction until February 24, 1978, when the Barton Tong Brace was removed.
During that hospitalization, Lute developed painful, abnormal sensations in both upper extremities, with the greatest pain being localized on the right side. He was unable to use his arms at the time in a useful or normal fashion. It was the opinion of Drs. Litel and Akins that the abnormal sensations were being caused by swelling or edema surrounding the nerves injured as a result of the fractured cervical spine.
At the time of his discharge from Memorial on March 14, Lute was fitted with a neck brace and was instructed to wear that brace at all times except when eating and shaving.
Ten days later, Lute returned to Dr. Akins' office complaining of gradually increasing pain in both arms and shoulders. He was re-admitted to the hospital, and a cervical myelogram was carried out in April of 1978. The diagnosis was made of cervical spondylosis at the C5, 6 and 6, 7 levels. Subsequently, a foraminotomy, a laminectomy and a fusion were performed on Lute by Drs. Akins and Litel. The purpose of the operation was to fuse the fractured vertebra and free the pinched nerves.
After recovering from that procedure, Lute was discharged from the hospital, but he continued to complain of loss of motion of the neck and pain radiating into the upper extremities, with the greatest complaints of pain being on the right extremities. An electromilogram was conducted by a local neurologist, Dr. Samieh, and it was his opinion that Lute had evidence of a bilateral carpal tunnel syndrome, which is compression of the medial nerve at the wrist. Thereafter, another surgical procedure was performed to release the nerves at the wrist to reduce the pain in Lute's hands.
It was the consensus of all medical experts testifying at the trial that Lute has reached maximum medical recovery and that he probably will suffer almost constant pain in his shoulders and upper arms from the nerve root damage. In addition, he has limited range of motion in his shoulders and neck. There is no further medical treatment that can be rendered to Lute to relieve or improve any of those residuals.
There also was testimony at the trial by Lute and his wife that he had been rendered sexually impotent by the injuries which he had received in the accident. Because of those complaints, Lute had been referred by Dr. Akins to Dr. Logan P. Perkins, Jr., a local urologist, for evaluation of the alleged sexual dysfunction.

*741 Dr. Perkins' examination of Lute revealed nothing of an organic nature to substantiate the existance of impotency. Thereafter, Dr. Perkins referred Lute to a sleep lab in Houston in an attempt to differentiate between an organic or psychological aspect of the dysfunction. Tests performed at the sleep lab revealed that Lute was capable, in the sleeping state, of attaining an erection. However, those findings did not confirm whether the cause of the alleged impotency was psychological or social, which were factors that could prevent the appropriate arousal. Dr. Perkins stated that the arousal factor is very significant and that pain could interfere with the ability to attain an erection. The testimony of the other medical experts at the trial was in agreement with Dr. Perkins' statements on pain and the arousal factor.

* * * * * *
There is no question that Lute suffered serious injuries in the January 21, 1978 accident. He was admitted to Lake Charles Memorial Hospital on ten occasions for those injuries and was hospitalized a total of eighty days at that institution. The sole question at this time is whether the jury's general damage award... was within a reasonable limit." (Emphasis added)
We conclude that the jury's general damage award was supported by the evidence. The record demonstrates and Aetna acknowledges that plaintiff will live in pain for the remainder of his life. Aetna lamely argues that plaintiff's constant pain is not substantial enough to support the jury's award. We think the measuring of another's constant pain is usually more difficult than calculating that person's loss of future wages. Hence, we feel more inclined to accept the verdict of the jury, which enjoys the distinct advantage of observing the plaintiff firsthand, weighing his credibility, and weighing the credibility of the other witnesses before determining what the plaintiff's pain is worth. Under this set of circumstances, we do not think the jury abused the "much discretion" the law has given it in assessing a plaintiff's general damages. La.C.C. Art. 1934(3); Reck v. Stevens, 373 So.2d 498 (1979); Coco v. Winston Industries, Inc., 341 So.2d 332 (1976).
II. IS AETNA ENTITLED TO INDEMNIFICATION FROM PENDLETON AND CONTINENTAL?
By agreement between the parties, this issue was tried by the court, rather than by the jury. The trial court discussed and resolved the issue in the following manner:
"... Lute, at the time of the accident, was an employee of Pendleton. A contract was in existence between Hercules and Pendleton, whereby Pendleton agreed to indemnify and hold harmless Hercules for any loss, damage or injury to any of its employees, unless such damage or injury resulted from the actionable negligence of Hercules. Continental insured Pendleton's obligation under the indemnity agreement. Hercules is not a party to this suit. A jury verdict was rendered in favor of Lute for his damages against Aetna as the UM carrier. Aetna seeks by its third party demand to recover the amount it has been cast in judgment from Pendleton and Continental by virtue of the indemnification agreement between Pendleton and Hercules.
The controlling principles are enunciated in Nieman v. Travelers Insurance Company, 368 So.2d 1003.
Under Nieman, Aetna, the UM carrier, is entitled to the rights granted specifically by R.S. 22:1406. If that statute affords rights to Aetna against Pendleton and Continental, then Aetna would be entitled to recovery on its third party demand. However, the statute does not specifically grant such rights to Aetna. Nieman further says that in the event the claim attempted to be asserted by the UM carrier is not covered by the statute, then the principles of subrogation come into effect. In such a case, the UM carrier is placed in the shoes of the creditor, which may or may not be the insured. In this instance, the creditor is Lute, not Hercules. Accordingly, since Lute has no *742 rights under the indemnification agreement between Pendleton and Hercules, Aetna, in being placed in the shoes of Lute, acquires no rights against Pendleton and Continental.
Aetna, however, is entitled to judgment in the amount of $50,000.00 on its third party demand against Pendleton and Continental because of the indemnity agreement between Pendleton and Hercules. The contract of insurance between Aetna ad Hercules provides for a $50,-000.00 deductible to be paid by Hercules. This deductible amount should be paid by Pendleton since under the indemnity agreement Pendleton agreed to indemnify Hercules from any such losses. Continental is the insurer of Pendleton's obligation under the indemnification agreement. To hold otherwise would produce the following result. Hercules, under its contract with Aetna, would be obligated to reimburse Aetna the $50,000.00 deductible amount. Yet, under the indemnification agreement with Pendleton, this amount should be paid by Pendleton instead of Hercules. Another unnecessary lawsuit would be precipitated involving the claim of Aetna against Hercules for the $50,000.00, and, in turn, the claim of Hercules against Pendleton and Continental for the $50,000.00 under the indemnification agreement. The present third party demand by Aetna against Pendleton and Continental for the full amount of the judgment is sufficiently broad to include this claim for partial reimbursement in the sum of $50,000.00.
As for the suggestion that this $50,-000.00 be deducted from Lute's judgment, Lute cannot be prejudiced by the contractual rights and obligations existing between Aetna, Hercules, Pendleton, and Continental. He is entitled to the full amount of his judgment without any deduction therefrom."
When the trial court decided the issue, he correctly determined that Aetna did not enjoy any subrogation rights against Pendleton and Continental because any right it did have would be acquired from the insured plaintiff (or creditor), Joseph Lute, rather than the insured Hercules. Since Lute can have no claim against Pendleton, his employer, or Continental, the insurer, other than his workmen's compensation claim, Aetna can have no claim against Pendleton or Continental.
The trial court's effort to avoid unnecessary lawsuits is laudable, but we believe the court erred in granting judgment in favor of Aetna and against Pendleton and Continental in the amount of $50,000.00 based on the indemnity agreement between Pendleton and Hercules. The important paragraphs of that indemnity agreement, paragraphs 9, 10, and 11, read as follows:
"9. The Service shall indemnify and hold harmless Hercules for any loss, damage or injury to the person or property of the Service and any of its employees or agents unless such loss, damage or injury which result from the actionable negligence of Hercules, its employees or agents. [sic]
10. The Service shall also indemnify and hold harmless Hercules from and against any claim for injury to any person, including loss of life, occasioned directly or indirectly, either wilfully or negligently by any person employed by the Service while engaged in the performance of work hereunder, unless said injury, including loss of life, shall result from the actionable negligence of Hercules, its employees or agents.
11. In the event of its liability under paragraphs 9 and 10 hereinabove set forth, the Service shall, at its own cost and expense, defend any action or proceeding brought against Hercules, and promptly pay or cause to be paid any judgment or other recovery against Hercules in any such action or proceeding, including damages, cost and allowances, and further shall pay to Hercules any cost and expense incurred by it in connection with any such claim, action or suit."
Pursuant to paragraphs 9 and 10 of the agreement, which the parties have agreed was in force at the time of the accident, Pendleton has agreed to hold Hercules *743 harmless for the injuries sustained by Lute or from and against any claim for Lute's injuries.
Pursuant to paragraph 11, in the event its liability in paragraphs 9 and 10 is triggered, Pendleton has agreed to defend any action or proceeding brought against Hercules, to promptly pay any judgment or other recovery against Hercules in any suit, action, or proceeding, and to pay to Hercules any cost and expense incurred by it (Hercules) in connection with any such claim, action, or suit.
Since no action or proceeding has been instituted against Hercules by any party to this lawsuit, and since there has been no judgment or other recovery against Hercules in any suit, action, or proceeding, Pendleton and Continental have incurred no liability under their indemnity agreement with Hercules. The judgment rendered against them on account of the indemnity agreement is therefore premature and cannot survive.
The progression of lawsuits envisioned by the trial court may occur as a result of this judgment. However, that is not the fault of the trial court or of this Court. The parties had ample time in which to add Hercules as a party plaintiff or defendant to this suit to fully resolve the issues of indemnity between Aetna and Hercules and between Hercules and Pendleton. They chose not to do so. If we were to affirm the trial court's judgment in favor of Aetna and against Pendleton and Continental, we would in effect be recognizing that Hercules is liable to Aetna for $50,000.00 under its contract of insurance with Aetna and that Pendleton would then be liable to Hercules for the $50,000.00 based upon its indemnity agreement with Hercules. We decline to make such conclusions when those issues were not fully tried and are not before the Court at this time. We only hold that since no action was brought nor judgment rendered against Hercules, Pendleton and Continental have incurred no liability based upon their indemnity agreement with Hercules.
III. ARE PENDLETON AND CONTINENTAL ENTITLED TO RECOVER FROM AETNA FOR WORKMEN'S COMPENSATION BENEFITS AND MEDICAL EXPENSES PAID TO PLAINTIFF?
The trial court answered this question as follows:
"The intervention of Continental seeking recovery of workmen's compensation benefits has also been presented to the court for determination.
Continental is restricted in its recovery to the proceeds of the policy coverage afforded Rogers by Dairyland in the sum of $5,000.00. It is not entitled to any of the proceeds owned by Aetna to Lute under its UM coverage: Gentry v. Pugh, 362 So.2d 1154 [(La.App. 2nd Cir. 1978), writ denied 363 So.2d 922]."
The Gentry case is exactly on point with the instant case insofar as this issue is concerned. Gentry held that an uninsured motorist carrier is not the type of "third person" from whom the workmen's compensation insurer can recover, under La.R.S. 23:1101-1103 (the workmen's compensation reimbursement statute), the amount it has paid in compensation to an employee who was injured by a third party tortfeasor. We will follow the Gentry case and affirm the trial court's judgment on this issue.[5]

DECREE
For the above and foregoing reasons, the judgment of the district court which granted judgment in favor of Aetna and against Pendleton and Continental in the amount of $50,000.00 is reversed; it is hereby Ordered, Adjudged, and Decreed that the third party demand of Aetna against Pendleton and Continental be dismissed. The judgment is affirmed in all other respects. Costs are *744 assessed one-half to Aetna and one-half to Pendleton and Continental.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Dr. Chisholm explained as follows:

"Discounting back to present value simply answers this question: How much if awarded today and invested at a certain rate of interest would allow an individual each year to receive what they would have made had they not been injured, but at the end of work life expectancy there would be nothing left in the fund ...."
[2] He further predicted that the rate of inflation would not be reduced to the 6% range for many years but he continued to use that figure because he was conservative.
[3] In his brief, counsel for Aetna suggests a formula utilized by this Court in Lanclos v. Hartford Accident & Indemnity Company, 366 So.2d 621 (La.App. 3rd Cir. 1978). There, at footnote 4, we observed that there are other ways to calculate the loss of future wages. Aetna offers us no reason to accept the Lanclos method over Dr. Chisholm's approach. Since Dr. Chisholm's method was apparently used by the jury, we will use it too, to determine whether the jury abused its discretion.
[4] We feel the jury might have awarded an even higher amount based on the evidence. Dr. Chisholm testified that a man at age 65 has a work-life expectancy of 5.7 years. Thus, the jury could have made a higher award based on plaintiff working until age of 70 or 71. While work past age 65 is speculative, Lanclos, supra (footnote 3), the Supreme Court has noted that any future loss is speculative, Robinson v. Graves, supra, and this Court has recently approved the use of a work-life expectancy past age 65. Huval v. Sinitiere, 376 So.2d 548 (La. App. 3rd Cir. 1979). Furthermore, no evidence suggests that Pendleton required its employees to retire at age 65.
[5] See 40 L.L.R. 748 for a critical discussion of the problem at issue here and in Gentry, the reimbursement of a compensation insurer by an uninsured motorist insurer. The discussion, authored by Professor Alston Johnson, agrees with the Second Circuit's resolution of the problem as expressed in Gentry.