396 So.2d 508 (1981)
Jules Frederick WEBB, Individually et al., Plaintiffs-Appellees,
v.
INSURANCE COMPANY OF NORTH AMERICA et al., Defendants-Appellants.
No. 8081.
Court of Appeal of Louisiana, Third Circuit.
March 11, 1981.
*510 Scofield, Bergstedt, Gerard, Hackett & Mount, Robert L. Hackett, Lake Charles, for defendants-appellants.
Salter, Streete & Hale, Frank T. Salter, Jr., Lake Charles, for plaintiffs-appellees.
Before GUIDRY, CUTRER and LABORDE, JJ.
CUTRER, Judge.
This suit arose from a vehicular collision in which the plaintiff's van was struck from the rear by a truck driven by Terry Richard. The plaintiff, with his two minor daughters as passengers, had stopped in a line of traffic in the eastbound land of Interstate 10 near Lake Charles. A jury awarded plaintiff, Jules Frederick Webb, $279,000.00 individually for his own personal injuries and $1,000.00 as administrator of the estates of his two minor daughters for personal injuries suffered by them. Named as defendants are Terry Richard, driver of the truck, Church Point Wholesale Grocery, Inc., Richard's employer and owner of the truck, and their insurer, Insurance Company of North America. It is undisputed that Richard was acting in the scope of his employment at the time of the accident. Defendants appealed.[1] We affirm.
The issues raised on appeal are: (1) Whether the jury was properly charged in order to decide the question of liability; (2) whether the defendants were deprived of effective discovery; and (3) whether the award of $279,000.00 for plaintiff's injuries is excessive.
The facts presented by the record are:
On February 22, 1979, at about 4:30 P. M., plaintiff, with his two minor daughters, was proceeding east on the interstate highway when, due to a traffic jam, he had to stop. He was stopped in the righthand lane of traffic on the down side of the Columbia Southern Railroad overpass. The plaintiff testified that the incline of the roadway at that point was very gradual. Plaintiff also testified that he had been traveling between 50 and 55 miles per hour as he approached the overpass. He stated that he had seen the line of traffic stopped ahead of him in ample time to stop. It was not necessary that he make a sudden stop. The evidence reflects that it was raining at the time of the accident.
Shortly after plaintiff stopped, his van was struck from the rear by a delivery truck. The right front of the truck struck the left rear of plaintiff's van. Plaintiff described the impact as a terrific jolt and said he thought he had broken his neck.
The driver of the truck, Richard, immediately approached plaintiff and apologized. He told plaintiff that he thought he could have avoided the accident but that the steering in the truck was bad. He also stated to the plaintiff that he was going about 40 miles per hour when he struck the van.
Plaintiff received serious injuries to his cervical region and the two children received minor injuries.
Plaintiff, at the time of the accident, was employed by Continental Oil Company as a welder. He did not return to his employment after the accident.

REQUESTED JURY CHARGES
The defendants contend that the trial court erred in failing to give certain jury instructions and that the jury was therefore not adequately charged in order for them to decide the question of liability.
The trial court is not required to give requested instructions simply because such instructions state correct principles of law. The requests are properly refused when the subject matter is irrelevant or sufficiently covered elsewhere in the charge. Darbonne v. Southern Farm Bureau Cas. Ins. Co., 300 So.2d 506 (La.App. 3rd Cir. 1974).
*511 With these principles in mind we examine the defendants' claim that the trial court erroneously refused certain proposed charges. The defendants sought additional instructions to the effect (1) that a following driver is only liable for his failure to avoid foreseeable danger, Flowers v. St. Paul Companies, 336 So.2d 1018 (La.App. 2nd Cir. 1976); (2) that as long as a motorist is traveling within the legal speed limit he is not required to slow his vehicle as he approaches an incline, curve or other natural obstruction which impairs his vision, Hightower v. Dixie Auto Insurance Company, 247 So.2d 912 (La.App. 2nd Cir. 1971); and finally, (3) that the plaintiff had a duty to remove his vehicle from the roadway if at all possible, LSA-R.S. 32:141.
We find that the requested charge relating to the foreseeability of the danger was adequately covered by the general charges given. The trial judge explained that recovery under our Civil Code article 2315 is based on fault. He charged that "fault" is conduct which falls below the standard of behavior which the law deems applicable to a particular activity. He stated that the standard is ordinarily care, and further stated:
"... it follows that ordinary care may require more or less caution, depending upon the danger which might reasonably be anticipated at the particular locality or under particular circumstances."

Under this charge it follows that a person cannot be held liable for failing to take precautions against danger which could not be anticipated, or was not foreseeable.
The requested charge, that the driver of the following vehicle had no duty to slow his vehicle because of the overpass, was not relevant. There is no testimony indicating that the grade of the overpass kept Richard from seeing the plaintiff's vehicle in time to stop. Richard's deposition, which was erroneously excluded from evidence by the trial court,[2] indicates that Richard saw the traffic jam before he crossed the overpass at a speed of 55 miles per hour. Richard also stated that he felt that there was no way the plaintiff could have avoided the accident and that he, Richard, could have avoided the accident if there had not been excessive play in the steering wheel. Richard stated that he had been having steering problems with the truck for quite a while. He notified his superior of the condition several times but Richard was told to keep operating it in that condition.
Further, Trooper Kershaw ticketed Richard upon his arrival at the scene because, in his opinion, Richard had probably been traveling too fast considering the weather conditions. Plaintiff testified that the grade of the overpass was very gradual and that he had no trouble stopping behind the car ahead of him.
Finally, we find that the requested charge, concerning LSA-R.S. 32:141, is not applicable to the case at hand. That statute requires the removal of a parked vehicle from the road if practicable. This statute is not applicable to a vehicle in a line of traffic that is moving slowly, stopping temporarily at times.
Even if the refusal of any or all of these instructions had been erroneous, an affirmance is still clearly appropriate since the evidence amply supports the jury's finding of liability.
It is well settled that if errors are made in jury charges an appellate court has the duty to review the facts in the record and affirm the verdict if it is consistent with the evidence. Andry v. Kinberger, 364 So.2d 613 (La.App. 4th Cir. 1978); Druilhet v. Comeaux, 317 So.2d 270 (La.App. 3rd Cir. 1975).
It is unnecessary to cite authority for the long-standing general rules that a driver should at all times be on the alert. He should steadily watch road conditions ahead as they are revealed and he should keep his *512 vehicle under such control and maintain such speed as is commensurate with the circumstances. The greater the known hazard the greater should be the degree of care exercised.
Richard testified that he approached the overpass at a speed of 55 miles per hour. He stated that it was raining at the time. He does not contend that he didn't see the line of traffic in time to bring his vehicle under control. The only explanation that he gave for the collision was that his steering mechanism was defective which kept him from going into the other lane in time to avoid striking plaintiff's vehicle. Richard's testimony clearly reflects that he operated the truck in a negligent manner as he violated the rules stated above. Also, he was operating a truck with a known defective steering mechanism which contributed to the occurrence of the accident. Whether the accident was caused by the negligence of Richard or whether it was caused by the known defective steering, or a combination of both of these causes, Church Point Wholesale Grocery, Inc., would incur liability. It was the owner of the defective vehicle which was being operated by its employee, Richard.

DENIAL OF DISCOVERY AND MOTION FOR CONTINUANCE
Defendants next urge that they were denied rehabilitation discovery and, because of this, are entitled to a new trial. Initially counsel argues that the trial court should have compelled the plaintiff to undergo examination by rehabilitation counselors to check plaintiff's disability. Defendants rely on LSA-C.C.P. art. 1493 for their assertion of the right to this mode of discovery. That article clearly refers only to examination by physicians. There has been no showing that such rehabilitation counselors were physicians. Article 1493 is inapplicable.
After the trial court's refusal to compel plaintiff to undergo the aforesaid examination, defendants filed extensive rehabilitation interrogatories. Defendants did not receive answers to the interrogatories until the day before trial began. Defendants then moved for a continuance. Defendants contend that they were unable to obtain evidence material to their case despite the exercise of due diligence and that they are therefore entitled to a continuance under LSA-C.C.P. art. 1602. LSA-C.C.P. art. 1458 allows fifteen days after service of interrogatories for answers to be filed. The interrogatories were filed on May 1, 1980, and plaintiff's responses were timely filed on May 16, 1980.
This suit was filed July 18, 1980. At the instance of the defendants, the trial had been continued twice previously. Trial was held on May 21, 1980. The filing of rehabilitation interrogatories on May 1, 1980, over nine months after suit was filed, cannot be said to be the due diligence that is contemplated by LSA-C.C.P. art. 1602.
Furthermore, the defendants received the answers prior to trial and have made no showing of additional material evidence which they have not been able to obtain. Thus, the defendants lack grounds for a continuance.
The trial court has wide discretion in acting on a motion for continuance. Sauce v. Bussell, 298 So.2d 832 (La.1974). We find no abuse of that discretion here.

QUANTUM
Finally, we must consider the question of quantum. The defendants question the existence of plaintiff's disability.
Plaintiff was a welder for Continental Oil Company. The testimony of plaintiff and his fellow workers indicates that welders at Continental Oil Company also function as boilermakers. The work requires heavy lifting and a considerable amount of climbing and awkward positioning of the body.
Dr. Roger Gimbell, a general practitioner of Sulphur, was the first to see plaintiff after the accident. He stated that the day following the accident, February 23, 1979, plaintiff complained of pain radiating into the left shoulder and arm. Reflexes were normal. He recommended conservative treatment and that plaintiff see a neurosurgeon.
Plaintiff consulted Dr. Dean Moore, a neurosurgeon, on April 2, 1979. Dr. Moore *513 testified that neurological findings per se were not present. Due to the fact that plaintiff's complaints had been persistent and he had not responded favorably to conservative treatment, Dr. Moore recommended that plaintiff undergo a myelogram. The myelogram was performed April 19th. Complications resulted from this test. A blood patch had to be done a few days later to stop the leakage of spinal fluid which had occurred following the myelogram. The myelogram demonstrated a herniated disc. Dr. Moore recommended an anterior cervical fusion. Plaintiff sought another opinion.
Dr. Harry Starr, a neurosurgeon from Beaumont, Texas, testified that he saw plaintiff on April 30, 1979. He found that plaintiff had a fairly typical cervical disc syndrome, or a herniated disc in the neck, which was pinching a nerve going down his left arm. Dr. Starr was cognizant of plaintiff's previous cervical injury which occurred in 1975. He testified that the deterioration and the spur he found to be causing plaintiff's problem had obviously been there before the accident of May 22, 1979, that it may have dated back to his original injury, or even before that. Dr. Starr stated that the trauma of the accident of February 22, 1979, resulted in a jar to the existing deteriorated condition of the disc causing the nerve to swell. Under these circumstances, the swelling of the nerve persisted and would not respond to conservative treatment. As a result of the accident, plaintiff was suffering weakness in his wrist, weakness of his triceps muscles, diminished triceps reflex, and numbness to his index, middle and ring fingers. He also had pain, stiffness and muscle spasms in his neck.
Conservative treatment proved to be a failure. Dr. Starr consequently performed an interlaminar dissection of the C-6, C-7 level, left, with decompressive forminotomy over a hard spur. After the operation plaintiff felt improved sensation and immediately showed increased strength in his left arm. Pain, spasm and soreness in the neck muscles remained. Four months after surgery the patient was still complaining of pain, particularly of soreness in his neck and upper back and still had a certain amount of spasm in the neck muscles. However, he had no further signs of impaired nerve supply to the upper left extremity.
Seven and one-half months after surgery plaintiff was still complaining of some symptoms. He complained that he did some work on his car and as a result got very sore, had a lot of pain on the left side of his neck, aching and numbness in his left arm, and headaches. These increased symptoms lasted some two weeks. Dr. Starr testified that if plaintiff avoided heavy work he would get along fine, with very little pain. He did not recommend that plaintiff undergo a second operation in the hope of returning to heavy work. Starr testified that he would not recommend that plaintiff return to his regular occupation or any type of heavy work that would require lifting, straining, or getting in awkward positions. He said that plaintiff could not return to the heavy work of a welder or boilermaker and might not be able to ever return to such work.
Dr. Moore saw plaintiff again after the operation by Dr. Starr. Due to plaintiff's continued complaints of pain radiating into his left arm, Dr. Moore suggested a repeat myelogram to determine if further surgery could be helpful. Plaintiff refused. His refusal does not seem unreasonable in light of the complications that arose after his previous myelogram and Dr. Starr's recommendation against further surgery. Dr. Moore also indicated that plaintiff could not return to work as a welder-boilermaker.
Plaintiff saw Dr. Gerald Litel, a neurosurgeon, before and after the operation. Dr. Litel testified that even with a good recovery from the operation nothing over fifty pounds should be lifted by a person who has had a cervical laminectomy. Dr. Litel further stated that plaintiff could not assume any awkward positioning of the body.
In summary, the medical testimony reflects that the trauma to plaintiff's neck suffered in the accident, super-imposed upon an existing deteriorated disc condition, resulted in an operation, all of which left plaintiff in a condition that would permanently *514 disable him from performing his usual work as a welder or boilermaker.
As to the loss of future wages, Dr. John Chisholm testified as an expert in the field of economics. Using plaintiff's tax returns for the past three years he computed his average annual income to be $23,350.03. He computed plaintiff's lost earnings at the time of trial to be $26,657.36.
Dr. Chisholm testified that plaintiff, 35 years old at the time of the accident, had a work life expectancy of 27.6 years. By using plaintiff's gross annual income of $23,350.23, plus a 2.6% per annum increase representing the average annual increase in productivity for the average American worker, plus a 6% annual increase representing the inflation factor, Dr. Chisholm calculated plaintiff's loss of future earnings to be $2,241,342.70. Calculating how much present recovery invested at 5% per annum would be necessary for plaintiff to receive each year what he would have made, if he had not been injured, over the remainder of his work life expectancy, Dr. Chisholm arrived at the figure of $957,781.82. Discounting at 7%, rather than 5%, the present value would be $714,432.70. Those figures were based on total disability.
Dr. Chisholm testified that, assuming plaintiff could return to some sort of employment and earn minimum wage, plaintiff would still incur a loss of $1,403,097.14 over his expected work life. Discounted at 5% this would yield a present recovery of $672,435.65.
The defendants point out that the plaintiff has completed 65% of the requirements for a business management degree and has a well above average capacity for learning. Thus they argue that $279,000.00 is an abuse of discretion in that it does not reflect that earning potential which the plaintiff still has.
There is no "right" formula for establishing the loss of future earnings. Lute v. The City of Lake Charles, 394 So.2d 737 (La. App. 3rd Cir. 1981), docket number 8039. Future loss of earnings cannot be calculated with absolute certainty. Lute v. The City of Lake Charles, supra; Robinson v. Graves, 343 So.2d 147 (La.1977).
The jury verdict does not assign specific amounts of the recovery for medical expenses, pain and suffering, and lost past and future wages, but simply awards one lump sum.
The loss of future earnings is only one element of the damages suffered by plaintiff. He has lost over $26,000.00 in past wages. The evidence indicates that medical expenses of approximately $7,000.00 were incurred. He endured substantial pain and suffering as a result of the accident. His testimony, as well as that of his family and friends, indicates that he has had to give up many of his former activities, such as weight lifting, coaching baseball and working on automobiles.
Considering these factors, in conjunction with the medical testimony, we find that the jury's award of $279,000.00 is clearly within its discretion. We find no error in this award.
For the above reasons, the judgment of the trial court is affirmed. The costs of this appeal are assessed to defendants-appellants.
AFFIRMED.
NOTES
[1] Richard was dismissed from the lawsuit by stipulation of counsel and no judgment was rendered against him.
[2] That deposition should have been admitted into evidence pursuant to LSA-C.C.P. art. 1450 since the party offering the deposition was unable to procure Richard's attendance by subpoena.