412 So.2d 1136 (1982)
Clayton S. GREEN, Plaintiff-Appellee,
v.
FARMERS INSURANCE COMPANY, et al., Defendants-Appellants.
No. 14798.
Court of Appeal of Louisiana, Second Circuit.
March 2, 1982.
*1137 Bruscato & Loomis by Albert E. Loomis, III, and Sam N. Poole, Jr., Monroe, for plaintiff-appellee.
Wilkinson & Carmody by John S. Odom, Jr., Shreveport, for defendants-appellants.
Before HALL, JASPER E. JONES and NORRIS, JJ.
NORRIS, Judge.
This suit for personal injuries arises out of a collision between a pulpwood truck in which plaintiff was a passenger and a tractor-trailer rig in Lincoln Parish. In a well written, comprehensive opinion, the trial court granted judgment in favor of plaintiff and against defendants in solido in the following particulars:

(1) General damages.................$ 50,000.00
(2) Loss of past earnings ........... 24,705.93
(3) Loss of future earnings
 and earning capacity ............. 83,746.54
(4) Special damages.................. 4,789.31
TOTAL $163,241.78

Additionally, the trial court recognized the right of Intervenor, Georgia Casualty and Surety Co., to recover the actual amount of workmen's compensation benefits and medical expenses paid to or on behalf of plaintiff in accord with the stipulation of the parties.
It is from this judgment that defendants appeal limiting their appeal to the awards made by the trial court relative to past earnings, future earnings and earning capacity.
At the time of the trial on December 17, 1980, plaintiff was seven days from being fifty-nine years old. As a result of the accident, plaintiff received serious injuries to his right shoulder, including a dislocation of the glenoid humoral joint, associated fracture of the humoral neck, concomitant and adhesive capsulitis, and a torn rotater cuff, which resulted in a twenty per cent permanent disability of that shoulder. The torn rotater cuff required surgery, and at the time of trial plaintiff continued to require an "airplane splint."
The record, including but not limited to the medical testimony, substantiates the trial court's findings that plaintiff was disabled rendering him unable to work from the date of the accident until at least April or May of 1981, and permanently unable thereafter to return to the heavy manual labor which he had engaged in throughout his work career because of the permanent impairment to his right shoulder. The trial court further found that plaintiff's earning capacity at the time of his injuries was that of a heavy construction worker receiving union wages although at the time of the accident he was working as a pulpwood cutter making $20.00 per load of pulpwood cut and hauled. It is the earnings awards based thereon of which appellants complain.
There is extensive testimony from plaintiff at trial concerning his work record. He served in the armed services from 1941-1946 working in an area which required physical labor. Immediately following his return to civilian life, he performed heavy physical labor at Planters Peanuts in Virginia, worked on a commercial fishing boat *1138 out of Norfolk for approximately four years, installed fences at an air force base in Maine for approximately eight months, loaded heavy cow hides for Mid-Town Packing Company for approximately seven years, and engaged in heavy construction work for Stone & Webster in Boston from 1964-1971.
Subsequently, plaintiff moved to Port Arthur, Texas, where he became a member of the construction and general laborers local No. 853. His union card as well as the testimony of Mr. Raymond Scott, secretary-treasurer of local No. 853 corroborates partially plaintiff's testimony regarding his union construction work. As a member of No. 853, plaintiff did heavy manual labor for C. A. Turner until October 29, 1976, after which he began working for Bomac clearing one hundred pound stumps until January 14, 1977. He then went to work for Stone & Webster operating a jack hammer and tamper until April 15, 1977, and on April 25, 1977, he began working for Gulf Refining Company engaging in the same types of activities until June 2, 1977. Following this employment, he worked for Spar Glass doing construction work until he went to Boston in early 1978. All of the aforedescribed jobs are entered on the work card which was introduced into evidence. The testimony of both the plaintiff and Scott[1] was to the effect that union wages were paid to plaintiff for these jobs.
Additionally, plaintiff testified to his having remained in Boston for approximately seven months working as a general laborer (non union) making $6.40 per hour for a forty hour week. After leaving Boston, he returned to Port Arthur where he was employed on a non union job doing basically the same type of work. His last job in Port Arthur was with Texaco making union wages of $7.81 per hour. This employment was terminated as a result of a strike and he moved to Lincoln Parish in the Spring of 1979. After coming to Ruston, he worked in the pulpwood business for others as well as Dunnaway.[2]
Plaintiff further testified that at the time of the accident he intended to return to Port Arthur and the construction trade because he knew more about this work as well as he made a greater salary from it. However, he did state that he had not made any contacts in Port Arthur prior to the accident because he intended to make a trip to Boston prior to his returning to Port Arthur. Additionally, he stated that he can barely read and write and that he had never held a job that did not involve manual labor.
Although plaintiff testified that he had someone file income tax returns for him during his residence in Port Arthur, a search revealed no such records. No employment data was available from Stone & Webster although requested because of the company's record retention schedule.
After considering all of the available evidence, the trial court concluded:
The plaintiff had worked for several years as a heavy construction worker and a union member drawing union wages as a Group A laborer, the highest category of the groups of members of the union based on the length of time in the area and the work. (Tr. test., Raymond Scott, p39, LL.18-26.) There is nothing to show that at the time he was injured he was not able to do this same kind of work he had pursued for several years, even *1139 though he was not then so employed. Thus, his earning capacity at the time of his injuries and disability was that of a heavy construction worker receiving union wages, although he was at the time working as a pulpwood cutter. A 20 percent permanent disability in the use of the right shoulder of a right-handed man would appear to render him totally and permanently disabled to engage in either of these occupations.
Finding from our review of the record that these factual findings are not clearly in error, we leave them undisturbed. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Cadiere v. West Gibson Products, Inc., 364 So.2d 998 (La.1978); and Danna v. Howard Griffin, Inc., 388 So.2d 446 (La.App. 2nd Cir. 1980).
After arriving at its conclusions of fact, the trial court determined its award for plaintiff's loss of past and future earning capacity utilizing the principles set forth in Folse v. Fakouri, 371 So.2d 1120 (La.1979) as follows:
The jury was entitled to determine from these and other factors in the record the probabilities and estimates of plaintiff's ability to earn money. What plaintiff earned before and after the injury does not constitute the measure. Even if he had been unemployed at the time of the injury he is entitled to an award for impairment or diminution of earning power. And while his earning capacity at the time of the injury is relevant, it is not necessarily determinative of his future ability to earn. Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976). Damages should be estimated on the injured person's ability to earn money, rather than what he actually earned before the injury.
While the general rule set forth in the Civil Code is that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party. La. Civil Code art. 1934(3). While this rule is stated in the Code to be applied where the contract has for its object the gratification of some intellectual enjoyment, the principle announced there may be applied by analogy to the loss of earning capacity where "damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party." It is a rule of reason and common sense applicable to contracts and torts alike.
Because the Court of Appeal apparently disregarded the claim for loss of past earning capacity, and considering the fact that there was evidence in the record, including the expert opinion of the actuary, which would support the jury award, we find no abuse of the "much discretion" which "must be left to the ... jury." in its award for loss of past earnings and past earning capacity. Schexnayder v. Carpenter, 346 So.2d 196 (La. 1977); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
Logically, a like result should apply to the claim of loss of future earning capacity. The Court of Appeal reduced this award from $100,000 to $58,500. The reduction was based upon the rationale applied to the reduction of the award for loss of past earnings. As noted in the discussion relating to the loss of past earnings and earning capacity, the Court of Appeal based the reduction there on the amount lost by calculating altogether on the pecuniary loss, without considering the contention that there was also a loss of earning capacity, disregarding the expert testimony that bus drivers earned at least $10,000 per annum.
Earning capacity in itself is not necessarily determined by actual loss; damages may be assessed for the deprivation of what the injured plaintiff could have earned despite the fact that he may never have seen fit to take advantage of that capacity. The theory is that the injury done him has deprived him of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
*1140 We have recently considered these principles in Hill v. Sills, et al., 404 So.2d 1323 (La.App.1981) wherein we stated:
It is now an established legal proposition in this state that a successful claimant is not only entitled to recover for his actual wage or income loss, but also for the effect of his disability on his capacity to earn. Even if unemployed at the time of injury, he may be entitled to an award for impairment of earning power. Such damages are calculated on the injured person's ability to earn money rather than on what he actually earned before the injury. The rationale underlying this jurisprudential rule is that the injury inflicted may have deprived the claimant of a capacity he would have been entitled to enjoy even though he never profited from it monetarily.
In an effort to help the lower court arrive at awards for loss of past earning capacity and loss of future earning capacity, both plaintiff and defendants offered the testimony of experts.
Dr. Charles O. Bettinger, III, director for the Center for Business Research and Economic Research at Northeast Louisiana University was accepted by the court as an expert in the field of projecting past and future lost wages. He testified that plaintiff had a work life expectancy of 8.7 years at the time of the accident and 7.3 years at the time of trial. Bettinger utilized the net rate of wage increase method keeping wages and interest rates in balance with one another because both are affected by inflation rates. He used a discount factor of six percent and arrived at a net rate of increase of slightly under one and one-half percent per year compounded annually. Using his method and the union contract figures of $8.81 per hour from the date of the accident until April 1, 1980 and $9.41 per hour thereafter as supplied by Scott, Bettinger computed plaintiff's loss of past earning capacity to be $26,800 from date of accident to date of trial.
To arrive at plaintiff's loss of future earning capacity Bettinger used the union contract hourly figure of $9.41 per hour × a 40 hour work week × 52 weeks × 7.3 years of work life expectancy to arrive at a figure of $149,420.00, the amount plaintiff would have earned under the union contract as a Class A union laborer. From this amount he subtracted $51,432.00 which was the minimum wage plaintiff would have earned from March 2, 1981 throughout his remaining work life expectancy. His final opinion as to loss of future earning impairment was $97,988.00. Bettinger did not deduct any workmen's compensation benefits or income taxes from his figures. He used a discount rate of six percent and an annual wage increase of seven and one-half percent. He also incorporated into his computations such fringe benefits as hospitalization, pension and training programs.
Dr. Jerry M. Hood, defendant's expert, is associate professor of Finance at Northeast Louisiana University and was also accepted by the court as an expert witness in the field of lost wages and future wages. His experience as an expert witness in court was not nearly as extensive as that of Dr. Bettinger.
Dr. Hood's approach was not drastically different from Dr. Bettinger's. However, he used a 7.9 year work life expectancy but the record is not abundantly clear whether this ran from the date of accident or date of trial. He used a 37.1 hour work week and 52 weeks a year. Hood testified that the 37.1 hour work week represented an average work week for a laborer in construction. Hood used the union contract figures of $8.81 per hour from July 31, 1979 through April 1, 1980 and the $9.41 figure thereafter. In computing loss of past earning capacity he deducted both workmen's compensation benefits and income taxes. In computing loss of future earning capacity he only deducted income taxes. The amount of his deduction for income taxes was admittedly estimated. His computation for loss of past earning capacity from date of accident to date of trial was $17,448.89. His estimate of loss of future earning capacity was $119,715.00 less what plaintiff could earn via minimum wage or $70,229.18. Without deducting income taxes *1141 his figures would have been $20,548.89 plus the amount of workmen's compensation benefits and $89,189.00 respectively.
Hood's discount factor was eight percent and his inflation also eight percent. So in essence they cancelled each other.[3]
The trial judge did not adopt either expert's computations but instead substituted his own detailed computations. He used Dr. Hood's average hourly work week for laborers of 37.1 hours stating that this figure appeared more realistic. Then using the hourly rate of $8.81 from July 31, 1979 to April 1, 1980 and the $9.41 hourly wage thereafter to date of trial he computed loss of past earning capacity to be $24,705.31. He made no deductions from this figure since plaintiff was not otherwise employed because he was unable to work during this period of time. He also noted that by recognizing the intervenor's claim, compensation benefits would be deducted from any award granted to plaintiff.
The trial court then used Dr. Bettinger's 7.3 years of work life expectancy from date of trial and the $9.41 hourly rate × the 37.1 hour work week × 52 weeks per year to compute the figure of $132,522.54 as plaintiff's maximum earning capacity for the remainder of his work life. From this sum he subtracted $48,776.00 which was the amount plaintiff would have earned at minimum wage for seven years. The trial judge calculated that 0.3 years from the date of trial could carry plaintiff to the anticipated date he was expected to reach his maximum improvement and could begin earning minimum wages. The trial court's final computation for plaintiff's lost future earning capacity was $83,746.54.
The trial court's formula did not use a discount factor or an inflation factor. However, according to Dr. Hood these factors were the same and effectively offset each other. Likewise, the trial court did not use Dr. Bettinger's net rate wage increase of one and one-half percent annually. The trial court also did not take into consideration possible overtime, fringe benefits or the possibility that plaintiff on some jobs might receive more per hour than the base union scale.
Basically, appellants' complaints concern whether or not plaintiff has sufficiently proven his claim for past and future lost earning capacity. They contend that the trial court abused its discretion in its computation of the disputed awards.
The trial court made a specific finding of fact that plaintiff's testimony regarding his work experience was credible. This was partially corroborated by the testimony of Raymond Scott. The determination of credibility is a function allocated to the finder of fact at trial because of its better capacity to evaluate a live witness compared with the appellate court's access only to a cold record. Canter v. Koehring, 283 So.2d 716 (La.1973); Williams v. Winn-Dixie of Louisiana, Inc., 404 So.2d 299 (La. App. 1st Cir. 1981). Since our review of the record is convincing that these factual findings are not clearly in error we leave them undisturbed. Arceneaux v. Domingue, supra.
In further support of our acceptance of the trial court's finding relative to this issue, we note that although it is better to introduce corroborating testimony, claims for lost wages have been proven in the past by plaintiff's own reasonable testimony, which was accepted as truthful. See Jordan v. Travelers Insurance Co., 257 La. 995, 245 So.2d 151 (La.1971); Davis v. Bowman, 346 So.2d 225 (La.App. 4th Cir. 1977); Bize v. Boyer, 402 So.2d 110 (La.App. 3rd Cir. 1981).
In conclusion and in addressing the issue of the excessiveness of the trial court's award, we note the mandate of the Supreme Court in Cheatham v. City of New Orleans, 378 So.2d 369 (La.1980) wherein it is stated:
The law on the issue of appellate review of damages is contained in La.Const. *1142 of 1974, art. V, § 10(B)8 and La.Civ.Code art. 1934(3).9 This Court has consistently held that Article 1934(3) does not violate the constitutional provisions of La.Const. of 1974, art. V, § 10. Revon v. American Guaranty and Liability Insurance Company, 296 So.2d 257 (La.1974). In interpreting Article 1934(3) this Court held in Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976);[4]
"before a Court of Appeal can disturb an award made by a trial court that the record must clearly reveal that the trier of fact abused its discretion in making its award.... Only after making the finding that the record supports that the lower court abused its much discretion can the appellate court disturb the award, and then only to the extent of lowering it (or raising it) to the highest (or lowest) point which is reasonably within the discretion afforded that court.... It is never appropriate for a Court of Appeal, having found that the trial court has abused its discretion, simply to decide what it considers an appropriate award on the basis of the evidence." (citations omitted).
In Robinson v. Graves, 343 So.2d 147, 149 (La.1977), the court states:
Future loss of earnings cannot be calculated with absolute certainty; this court has recognized that damages for the loss of future earnings are somewhat speculative in character. See e.g., Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). Absent an abuse of discretion by the trier of fact, however, this degree of uncertainty does not permit the reviewing court to substitute its judgment for that of the trial court merely because the reviewing court believes that a different award would have been more appropriate. As this court stated in Bitoun v. Landry, supra [302 So.2d 278 (La.1974)]:
"... The question is not whether a different award might have been more appropriate, but whether the award of the trial court can be reasonably supported by the evidence and justifiable inferences from the evidence before it. That such evidence might also support a greater (or smaller) award will not justify a change in the amount by the appellate court. Only when the trial court abuses its broad discretion should the award be adjusted, either up or down." 302 So.2d at 279.
In Schexnayder v. Carpenter, 346 So.2d 196, 198 (La.1977), the court stated:
"Since the jury does have, under the law, much discretion in fixing damages, the appropriate procedure for testing whether the jury abused its discretion is to determine whether the award can be supported under the interpretation of the evidence most favorable to the plaintiff which reasonably could have been made by the jury."
It is also noted that in cases of this nature there is no "right" formula for establishing the loss. While net wages are sometimes used, the use of gross income is also appropriate. See Lute v. City of Lake Charles, et al., 394 So.2d 736 (La.App. 3rd Cir. 1981). We recently in the case of Hunter v. Office of Health Services, et al., 385 So.2d 928 (La.App. 2nd Cir. 1980) allowed the use of gross income in computing income in order to determine a loss of support award.
*1143 Therefore, adhering to the above well established legal principles, realizing that damages of the nature complained of in this appeal cannot be calculated with certainty but are somewhat speculative in nature, and finally recognizing that there is no "absolutely right" formula for establishing such a loss, we cannot say that the trial court abused the "much discretion" vested in it in its awards of loss of past and future earnings and earning capacity. Admittedly, the instant awards are in the higher range of the lower court's discretion, but we find that they do not constitute an abuse of that discretion.
Accordingly, the judgment of the lower court is affirmed in its entirety. Appellants are cast for the costs of this appeal.
AFFIRMED.
NOTES
[1] Raymond Scott testified that he knew and recognized plaintiff who had worked out of his union and had been a member. He further testified that the present union contract in effect for his local afforded all members of the union its benefits. Pursuant to the contract on July 31, 1979, local No. 853 union members were drawing a base rate of $8.81 per hour as of April 1, 1980. He further testified that plaintiff was classified as a Group A Laborer with local 853 and stated that this was the highest laborer classification. He further indicated that the union conducted tests to determine if a worker was in fact a Class A Laborer. The $9.41 base rate was in effect at the time of trial and was the lowest rate a union member could receive and there were premiums for other types of construction work such as tamping or working with concrete.
[2] Plaintiff was on his first day on the job with Dunnaway when the accident that produced his injuries and resulting disability occurred.
[3] It should be pointed out that both experts also computed loss of past earning capacity and loss of future earning capacity based on plaintiff's wages as a pulpwood cutter. However, for the sake of brevity, we do not choose to incorporate these figures into this opinion.
[4] Footnotes 8 and 9 referred to in Cheatham, supra, read as follows:

8 La.Const. of 1974, art. V, § 10(B) provides the scope of review for appellate courts as follows: "Except as limited to questions of law by this constitution, or as provided by law in the review of administrative agency determinations, appellate jurisdiction of a court of appeal extends to law and facts."
9 Louisiana Civil Code Article 1934(3) provides in pertinent part: "Although the general rule is, that damages are the amount of the loss the creditor has sustained, or of the gain of which he has been deprived, yet there are cases in which damages may be assessed without calculating altogether on the pecuniary loss, or the privation of pecuniary gain to the party...
In the assessment of the damages under this rule, as well as in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury, while in other cases they have none...." (Emphasis added).