364 So.2d 1325 (1978)
Patricia Ann ROUNDTREE, widow of Elmo C. Burmaster, Jr.
v.
TECHNICAL WELDING AND FABRICATION COMPANY, INC. and Ed Ehrmann and Hunt-Wesson Foods, Inc.
No. 9491.
Court of Appeal of Louisiana, Fourth Circuit.
November 8, 1978.
Rehearing Denied December 15, 1978.
*1328 A. Remy Fransen, Jr., Robert J. Neal, New Orleans, for plaintiff-appellee.
Leach, Paysse & Baldwin, Michael A. Britt, New Orleans, for intervenor-appellee.
James J. Morse, Jr., New Orleans, for defendants-appellants.
Before SAMUEL, GULOTTA and BEER, JJ.
GULOTTA, Judge.
In this wrongful death action, defendants appeal from a $668,157.32 trial judge award in favor of a childless surviving spouse of a thirty year old workman who died from injuries sustained on July 27, 1974, in a thirty foot fall from an oil storage tank. Plaintiff has not answered the appeal.
Plaintiff's claim against decedent's employer, Technical Welding and Fabrication Company, Inc., and its chief executive officer, Ed Ehrmann, is based on the failure to provide a safe place to work, proper supervision and proper safety devices. Judgment was rendered against the employer's liability insurer[1] and the executive officer.[2]
On appeal, defendants contend plaintiff's recovery is barred by decedent's contributory negligence and/or assumption of risk.
Alternatively, defendants claim the award is excessive. We amend and affirm.

LIABILITY
Decedent, Elmo C. Burmaster, Jr., was a member of a crew demolishing a metal oil storage tank approximately thirty feet in height and seventy-eight feet in diameter. The tank was constructed of 3/16" sheet steel plates measuring four to five feet in width and either ten or twenty feet in length which were riveted onto a "super-structure", a framework of beams. See photographs *1329 (Appendices I and II). These supportive beams in the roof area radiate from the center of the tank in a spoke-like fashion. All of the roof plates were supported by pieces of superstructure with the exception of two "critical" plates which were not firmly supported.
Burmaster was usually employed as a "ground man" who smoothed the jagged edges of the plate after they had been lowered to the ground. On the day of the accident, however, he was working on the roof and cutting plates with a fellow worker. As he walked toward his co-worker, Burmaster stepped on one of the "critical" sheets which gave way causing him to fall through the roof to the bottom of the tank, thirty feet below.
In support of their contention that decedent was contributorily negligent or assumed the risk, defendants point out that though unsafe conditions existed on the job site, Burmaster knew that certain parts of the roof were unsafe and chose to work under these conditions; and that his failure to work cautiously constitutes contributory negligence which was the proximate cause of his fall. We reject these contentions.
It is undisputed that no safety nets or belts were used on the job in accordance with federal safety requirements.[3] Though Ehrmann testified, in deposition, that he had warned Burmaster at lunch on the day of the accident that the critical sheet was "coming up", Michael Darbonne, decedent's co-worker on the roof, testified that Ehrmann had not given him (Darbonne) any warning that the two plates were not supported. He indicated further that "nobody knew" of the unsupported plates. Assuming that Ehrmann did give oral warning of the critical plates, it is undisputed that they were not identified or marked in any manner to distinguish them from the other plates on the roof.
E. J. Scardino, Jr., a Safety Engineer, testified that giving a warning without marking the hazardous plate was "ludicrous". Scardino stated there was no evidence of any type of a good safety program and the accident could have been prevented by clearly identifying the hazard, removing it, or putting bracing underneath it.
The evidence on liability is somewhat meager. Although no written reasons relating to liability were assigned, it is clear the trial judge believed the executive officer did not warn the decedent or his coworker of the dangerous unsupported plates. Although a conflict existed on this factual question, (between Darbonne and Ehrmann) it is reasonable to conclude that the trial judge resolved the conflict in favor of plaintiff. We cannot say the trial judge, in this respect, erred.
In Chaney v. Brupbacher, 242 So.2d 627 (La.App. 4th Cir. 1970), we held that an employer and its supervisory personnel have the obligation to provide workmen with a reasonably safe working place. We stated in Chaney:
"[I]n our opinion a workman's superior cannot create or permit danger and send the workman into it with a warning and escape liability on a theory that the workman was contributorily negligent merely by going into the danger. The workman's only other alternatives are to try to tell his superior how to run the job, or to quit."
In the instant case, the decedent was performing his duties on the top of the tank without safeguards and without warning of the dangerous unsupported metal plates.
*1330 Under the circumstances we find no error in the apparent conclusion reached by the trial judge that Burmaster was not guilty of contributory negligence or assumption of risk.

QUANTUM
Under LSA C.C. art. 2315, in a suit resulting from the death of a tort victim, two claims exist. The first is the "survival" action for the damages sustained by the tort victim. These damages, for which the tort victim could have recovered had he lived, is brought by his "survivor", i. e. his spouse or other persons named in LSA C.C. art. 2315. The second is the "wrongful death" action for damages to the survivor for the loss resulting from the victim's death. See Callais v. Allstate Insurance Company, 334 So.2d 692 (La.1976), on rehearing; King v. Cancienne, 316 So.2d 366 (La.1975); Wakefield v. Government Employees Insurance Company, 253 So.2d 667 (La.App. 4th Cir. 1971), writ denied, 260 La. 286, 255 So.2d 771 (1972). The survival action includes recovery for pain and suffering, loss of earnings, and other damages sustained by the victim up to date of death. King v. Cancienne, supra; Payne v. Georgetown Lumber Company, 117 La. 983, 42 So. 475 (1906); Dark v. Brinkman, 136 So.2d 463 (La.App. 3d Cir. 1962). The wrongful death action includes damages to the survivor for loss of love and affection, loss of services, and loss of support. Ayala v. Bailey Electric Company, Inc., 318 So.2d 645 (La.App. 4th Cir. 1975); Howard v. Hardware Mutual Casualty Company, 253 So.2d 555 (La.App. 1st Cir. 1971), writ denied, 260 La. 19, 254 So.2d 620 (1971). The loss in the wrongful death action includes loss of support from the date of death to the date of trial and loss of future support from the date of trial. Wakefield v. Government Employees Insurance Company, supra.
The damage award to plaintiff by the trial judge consisted of the following amounts:

 $125,000.00 - decedent's pain and suffering
 39,285.00 - past loss of income
 75,000.00 - plaintiff's loss of love and
 affection
 40,000.00 - plaintiff's loss of services
 368,212.00 - plaintiff's loss of support and
 future income
 19,660.32 - stipulated medical expenses
 1.000.00 - funeral expenses
 ___________
 $668,157.32 - TOTAL[4]
Though defendants do not dispute the medical and funeral expenses, they argue that the other aspects of the award constitute an abuse of the trial court's discretion. We agree, and reduce the award to $269,779.32 (including the undisputed medical and funeral expenses).
Survival ActionDecedent's Pain and Suffering
The medical evidence is essentially undisputed. Immediately after the July 27, 1974 fall, Burmaster was taken to the Emergency Room of West Jefferson Hospital. He was seen at the hospital by Dr. Jack L. Winters, an orthopedic surgeon, who determined that he had sustained a fracture dislocation of the main joint of his left foot with laceration of the skin, multiple open tarsal fractures of the left foot, comminuted closed fractures of the right leg between the knee and the ankle, a closed fracture of the right ankle, a closed comminuted fracture of the right wrist and forearm, dislocation and disruption of the right distal radial ulna joint, a comminuted fracture of the fourth lumbar vertebrae involving the spinal cord, traumatic shock and a cerebral concussion. It was also ascertained that Burmaster had abdominal internal injuries and rupture of the joints on the left side of the breast bone. Casts were *1331 placed on both lower extremities and the fractures were aligned as well as possible. Dr. Winters described Burmaster's pain as "marked and severe".
Burmaster remained in Intensive Care until August 2, 1974. On August 13th the casts were changed and an attempt was made, without success, to set the leg fracture. The right wrist and forearm were also set.
Dr. Carl F. Culicchia, a neuro-surgeon, testified that the compression fracture of the lumbar vertebrae had lacerated and contused the nerves of the spinal canal. On August 16, Burmaster underwent a laminectomy and spinal fusion. Dr. Culicchia noted that the spinal injury was such that Burmaster, though partially paralyzed, could still feel pain. This physician described decedent's injuries as "extensive and painful" and stated that it was necessary to give him intravenous pain suppressants. Following surgery Burmaster experienced paralysis of the lower extremities.
On September 6, 1974, while under anesthesia for another operation, Burmaster underwent cardiac arrest due to a pulmonary embolism (a blood clot lodging in the lung) and was given cardiac massage. He regained consciousness, and according to Dr. Winters was aware of how seriously ill he was at that time. While Burmaster was still in the recovery room of the intensive care unit, he suffered another cardiac arrest and died on the operating table. Dr. Bert A. Glass, the attending surgeon, was of the opinion that Burmaster had suffered a laceration of the liver in the accident which healed during bed rest but was reopened during cardiac massage.
In addition to their testimony regarding the severity of Burmaster's pain, Drs. Winters and Culicchia stated the decedent was conscious of the gravity of his condition and aware of his disability potential. Plaintiff testified that her husband, during his hospitalization, constantly complained of pain which he characterized as "hell on earth". She further stated that Burmaster worried whether or not he would live, walk again, or father children. Mrs. Burmaster further stated that decedent talked of dreams and premonitions of his death.
Considering the severity of Burmaster's multiple injuries and the pain and anxiety he suffered during his forty-one days of hospitalization from the accident until his death, we cannot say the trial judge abused his discretion in awarding $125,000 for decedent's "conscious intense pain and suffering, emotional distress, abject fear of death and/or permanent paralysis."
Survival ActionLoss of Wages
At the time of his accident decedent was working as a welder burner at the rate of $5.00 per hour. He had been employed by Technical Welding for only six weeks prior to his fall and received an average gross weekly pay of $242.50 which was projected to an annual pay of $12,610.00.
The trial judge awarded loss of past income in the amount of $39,285 (from the date of the accident on July 27, 1974 to the date of trial on September 7, 1977). This figure was based on the testimony of Sidney A. LeBlanc, an actuary who used the $12,610/year gross income amount in his calculation.
In a survival action the survivor is entitled to an award for past loss of income, from date of the tort to date of death. King v. Cancienne, supra; Payne v. Georgetown Lumber Company, supra; Dark v. Brinkman, supra. In our case, that period is six weeks. (July 27, 1974 to September 6, 1974). The trial judge erred in computing loss of past wages from the date of the accident to the date of the trial (approximately three years). Accordingly, we reduce the award for loss of past wages to the sum of $1,455.00, based on the average weekly wage of $242.50.
*1332 Wrongful DeathLoss of Love and Affection
Plaintiff and decedent had been married at the time of decedent's death for approximately two years. Mrs. Burmaster testified that they enjoyed a close relationship and shared ideas, thoughts and activities. Though they had no children she stated they had plans for a family when they achieved a greater measure of financial security. Plaintiff testified that the loss of her husband had a tremendous effect on her and left "a big void" in her life.
Though we recognize the Burmasters' enjoyed a warm relationship during their brief marriage, we see no unique aspect to their union which supports a $75,000 loss of love and affection award. A marriage of much longer duration may warrant such an award, however this amount, considering the relative brevity of the marriage, is excessive and an abuse of the much discretion rule. Consistent with Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1977), we deem a proper award for loss of love and affection to be the sum of $20,000.00.
Wrongful DeathLoss of Personal Services
With regard to services performed by her husband, plaintiff testified that Burmaster did his own auto repairs, yard work around their rented apartment, and installed their washer, dryer and ice maker. She also stated that they collected driftwood from which her husband made furniture.
The services testified to by Mrs. Burmaster are those that any husband, to a lesser or greater degree, would perform and are not compensable items of recovery for loss of services in a wrongful death action.
In this connection we distinguish Ayala v. Bailey Electric Co., Inc., 318 So.2d 645 (La.App. 4th Cir. 1975). In Ayala, the deceased husband's sole income was derived from rental properties which he maintained. Following his death, his wife was required to obtain help to manage and maintain the property. Furthermore, in Ayala a value was placed by a real estate expert on the husband's lost services. Unlike the decedent in Ayala, Burmaster merely performed routine chores and engaged in a hobby of furniture making. Furthermore, no proof of the value of these services was presented. Under these circumstances, we conclude plaintiff has failed to establish entitlement to this part of the award.
Wrongful DeathLoss of Support
Loss of future support was awarded to Mrs. Burmaster in the amount of $368,212.00 and was based on calculations made by Melville Z. Wolfson, an actuary who used the annual salary figure of $12,610; a work life expectancy of 29.2 years, (decedent was thirty years of age at the time of the accident); a 6% discount factor; and a combined inflation/productivity factor of 6% (3½% inflation and 2½% productivity, i. e. anticipated increase in salary).
Defendants contend the trial judge erred in using an improper wage base of $12,610 per year instead of a $5,000 per year figure as reflected in Burmaster's 1972, 1973 and 1974 joint tax returns, and also, in failing to deduct consumption factors and income taxes. According to defendants, based on the testimony of Doctor Wolfson, Burmaster would have used from thirty to fifty percent of his pay for personal needs (consumption factor) and his gross income would have been subject to an eighteen percent deduction for taxes, making the actual amount available to support his wife considerably less than his gross pay at Technical.
We recognize a well-settled rule that future loss of earnings cannot be calculated with absolute, mathematical certainty and that damages for future loss are, to a certain extent, speculative in character. Robinson v. Graves, 343 So.2d 147 (La.1977); Viator v. Gilbert, 253 La. 81, 216 So.2d 821 (1968). We recognize, also, that the trial *1333 judge in determining the measure of damages for loss of future support must consider a number of factors including the employee's work record, the amount of his earnings in previous years, and the probability or improbability that he would have been capable of earning comparable or similar amounts for a number of years during his work life expectancy. Viator v. Gilbert, supra; Edwards v. Sims, 294 So.2d 611 (La. App. 4th Cir. 1974).
Significantly, Burmaster's employment record prior to his job at Technical Welding had not been steady. A joint tax return for 1972, during which time both plaintiff and decedent were employed, shows income from wages in the sum of $7,192.00. The couple's 1973 joint return, with both employed, shows income of $8,917. The 1974 joint return shows income of $8,158 of which Burmaster had earned $3,860 at two occupations (including welding at Technical) until his accident in July. Mrs. Burmaster had earned the remainder of the income in a hospital job. During this three year period Burmaster had been employed part-time as a night watchman and held jobs in an electronics firm for three months, and as a welder for two building firms before his job at Technical Welding.
When we consider Burmaster's spotty work record in the years prior to his accident, his gross income as reflected in his tax returns, and the short period of time (six weeks) that he had worked for Technical Welding, we are led to conclude the trial judge erred in accepting, for the purpose of determining future loss of support, an annual gross income of $12,610.00. A more realistic base, considering Burmaster's history of earnings, is $5,200 per year upon which Sidney LeBlanc, an actuary, based his calculation, under cross examination, for loss of future support.
Closely akin to our factual situation is Viator v. Gilbert, supra, a case involving a plaintiff with a sporadic work record characterized by frequent job changes and periods of unemployment. In rejecting plaintiff's argument that the relatively high wages he received as a truck driver during a three month job shortly before the accident should be the basis for calculating his loss of future wages, the court stated:
"[W]e do not believe that this three or four month employment controls. On the contrary, the whole work record should be scrutinized, as it is the totality of the circumstances which must be the ultimate criterion in the assessment of the damages for loss of future earnings. While we sympathize with plaintiff because of his unfortunate physical condition, we think it clear from the evidence that he has failed to establish with any degree of certainty a record of prior regular employment and earnings, from which can be deduced that he was able, before the accident in this case, to earn wages as a manual laborer consistently for any substantial work period."
We further conclude the 2½% productivity factor relied on by the trial judge based on anticipated increases in salary is not applicable to Burmaster's situation. Though it is true LeBlanc testified that productivity per man hour increases about 2½% per year, proof was lacking to show this factor would have an effect on Burmaster's particular case. The only testimony regarding the decedent's possibility of wage increase was Mrs. Burmaster's statement that she believed Ehrmann was considering her husband for a promotion to a supervisory position sometime in the future. No evidence from the employer or a supervisor was offered to indicate that decedent was being considered for promotion or higher pay. Without this evidence and mindful of decedent's spotty work record, we cannot conclude decedent's future pay would include increase based on productivity.
We distinguish Robinson v. Graves, supra. In Robinson plaintiff was employed at a salary of $400 per month plus overtime at the time of her accident. Post injury, plaintiff was promoted to a $500.00 per *1334 month position and then became disabled. At the time of trial her employer testified that the position for which she was training paid $800.00 per month and had plaintiff continued to work she probably would have been earning this increased salary. The Supreme Court in Robinson held that the $700.00 base salary figure used by the trial judge in awarding loss of future income was within a proper range of discretion. Unlike the employee in Robinson, however, decedent, in our case, had a history of job changes and had only worked for Technical Welding for a six week period. Sufficient proof of probability of salary increase is simply lacking in our record. Accordingly, we do not include increased productivity in computing entitlement for loss of future support. However, we recognize that an inflation factor may be included when computing this loss. See Blanchard v. Rodrigue, 340 So.2d 1001 (La.App. 1st Cir. 1976), writ denied, 341 So.2d 1129 (La.1977).
Defendants argue that in a wrongful death case, personal living expenses of the deceased should be deducted from any award for loss of future support. We agree. Although we have failed to find jurisprudential support for this deduction in a Civil Code 2315 wrongful death case, reasonableness requires a reduction in the loss of future support awards for those personal living expenses.
In Jones v. Kansas City Southern Ry. Co., 143 La. 307, 78 So. 568 (1918), on rehearing, the Louisiana Supreme Court, when considering future support benefits under a Federal Employers' Liability Act, concluded that the amount of future support benefits is the difference between that which the decedent would have earned and the amount he would have spent upon himself had he lived the normal life expectancy. The Jones court computed this amount at twenty-eight and one-half percent and deducted the award to that extent.[5] We recognize that the Federal Act in the Jones case, (as interpreted by the Louisiana Supreme Court) provided for this deduction. Nevertheless, the deduction was recognized and applied.
Further, in Blanchard v. Rodrigue, supra, the decedent's "personal expenses" was included in a list of factors to be weighed in determining the amount due for loss of support. The Rodrigue case involved a wrongful death action arising out of an automobile accident. See also, Aubert v. Charity Hospital of Louisiana, et al., 363 So.2d 1223 (La.App. 4th Cir. 1978), where reference is made to decedent's personal expenditures when computing loss of future support. Under Maritime Law, reductions attributable to personal expenses have been made when computing loss of earnings. See Law v. Sea Drilling Corp., 510 F.2d 242 (5th Cir. 1975); Higginbotham v. Mobil Oil Corporation, 360 F.Supp. 1140 (U.S.D.C. W.D., La.1973).[6] In the cited Federal cases, involving the deaths of offshore workers, a fifteen percent deduction was allowed.
Accordingly, we conclude that among the factors to be considered when computing loss of future support in a wrongful death case, is a deduction for the decedent's personal living expenses. (Consumption factors). Evidence in our case indicates that Burmaster lived a frugal life with little self indulgence. Under the circumstances, we find that a twenty percent deduction is reasonable.
We reject the contention that an eighteen percent deduction for future income tax should be taken from decedent's future wages when calculating plaintiff's *1335 loss of support. In this connection, Doctor Wolfson testified that it is difficult to project, with any certainty, what the tax rate will be 29.2 years into the future. Though the court in Edwards v. Sims, supra, in dicta, stated that net income after taxes is the appropriate base upon which to calculate loss of future income, this court in Morgan v. Liberty Mutual Insurance Company, 323 So.2d 855 (La.App. 4th Cir. 1975), stated that courts have the option of using gross income in awarding loss of future wages. See also, Reeves v. Louisiana and Arkansas Railroad Co., 304 So.2d 370 (1st Cir. 1974), writ denied, 305 So.2d 123 (La. 1974). The trial judge in our case used gross income in awarding loss of future support. We cannot say (based on Morgan, Reeves and Blanchard) he erred.
Accordingly, based on a $5,200.00 annual income, discounted at six percent and taking into account three and one-half percent inflation factor, and a work life expectancy of 29.5 years, LeBlanc calculated plaintiff's loss of future support at $108,830.00.[7] Accepting this amount and allowing for a twenty percent personal living expense deduction, we compute plaintiff's loss of future support at $87,064.00.[8]
This award for future support does not include the loss of support to plaintiff between the date of Burmaster's death and the time of trial, a period of three years. Using the same method for calculating loss of past wages employed by the experts, i. e., simple multiplication of the annual wage by the number of years without allowing for discount or inflation (relevant to an award for future support loss) we compute this amount at $15,600.00.[9]
Based on the foregoing, we conclude plaintiff is entitled to an award in the following amount:

 $125,000.00 - decedent's pain and suffering
 1,455.00 - loss of past wages
 20,000.00 - loss of love and affection
 87,064.00 - loss of future support
 15,600.00 - loss of support from date of
 death to date of trial
 19,660.32 - medical expenses
 1.000.00 - funeral expenses
 ___________
 $269,779.32 - TOTAL

Accordingly, the judgment in favor of plaintiff, in the sum of $668,157.32 is amended and reduced to the sum of $269,779.32. As amended, the judgment is affirmed.
AMENDED AND AFFIRMED.
BEER, J., concurring in part and dissenting in part.
Appendix to follow.
*1336 
*1337 
*1338 BEER, Judge, concurring in part and dissenting in part.
I concur in the majority's opinion in all respects except that portion of the opinion dealing with an award for decedent's pain and suffering in the amount of $125,000.
I conclude that the trial court's award of this amount for decedent's pain and suffering is a breach of discretion and, accordingly, respectfully dissent from the affirmation of that award. I specifically acknowledge that such dissent will not result in the applicability of La.Const.1974, Art. 5, Sec. 8(B) since this specific portion of the trial court award is affirmed by the action of the majority.
NOTES
[1] Because this accident occurred prior to the enactment of the exclusive Workmen's Compensation remedy (against an employer) as set forth in Act 147 of 1976 and incorporated in R.S. 23:1032, the exclusive remedy question is not in issue.
[2] Hunt-Wesson Foods, Inc., Dixie Oil of Tennessee, and Coastal Fuels, Inc. also named as defendants were dismissed prior to trial.
[3] A citation issued by the Occupational Health Administration (OSHA), made part of the record, alleges that Technical Welding violated federal regulations by failing to "require wearing of appropriate personal protective equipment where there was exposure to hazardous conditions or where the need for using such equipment to reduce the hazards to employees was indicated."
[4] Judgment was further rendered in favor of intervenor, the Travelers Insurance Company for $31,190.32 (representing medical and funeral expenses and workmen's compensation benefits) to be paid by preference from plaintiff's award. This aspect of the judgment is not contested on appeal.
[5] The Supreme Court stated, in the opinion:

"He was earning $2,100 a year, and, from the evidence of his good habits, we have concluded that $600 a year is a fair allowance to be made for what he would have spent for his own maintenance."
[6] For a discussion of deductions for living expenses and costs of a decedent's maintenance, see 22 Am.Jur.2d, Death § 153; 25A C.J.S. Death § 114; Speiser, Recovery For Wrongful Death (2d ed., 1971), Vol. 1, § 3:6 at 140. See, also, Louisville & N. R. Co. v. Garnett, 129 Miss. 795, 93 So. 241 (1922).
[7] LeBlanc arrived at this amount by using earnings in the amount of $100 per week or $5,200.00 per year (more accurately representative of Burmaster's history of earnings than $242.50 per week or $12,610 per year). By comparison, Melville Wolfson calculated loss of future support based on a 29.2 year work life expectancy with a 5% discount rate and 3% increase in the amount of $107,410.00.
[8] When deducting twenty percent from $108,830.00, the balance amounts to $87,064.00.
[9] $5,200.00 per year for a three year period (date of death, September 6, 1974 to date of trial, September 7, 1977).