563 So.2d 317 (1990)
Charles R. HARRIS
v.
TENNECO OIL COMPANY, Lou-Con, Inc., and C.V. Harold Rubber Company, Inc.
No. 89-CA-0825.
Court of Appeal of Louisiana, Fourth Circuit.
May 23, 1990.
Rehearing Denied July 19, 1990.
*318 Robert J. David, Gainsburgh, Benjamin, Fallon, David & Ates, Frank J. D'Amico, Sr., Frank J. D'Amico, Jr., New Orleans, for plaintiff-appellee.
Jerald L. Album, H. Philip Radecker, Jr., Abbott, Best & Meeks, New Orleans, for defendant-appellee, Fluor Engineers, Inc.
Jesse R. Adams, Jr., Thomas S. Morse, Adams & Johnston, New Orleans, for defendant-appellee, C.V. Harold Rubber Co., Inc.
John G. Gomila, Jr., Mana Lisa Pratt, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, for defendant-appellant, Tenneco Oil Co.
Ronald L. Ronzello, Charles R. Capdeville, Metairie, for defendant-appellee, Lou-Con, Inc.
Before BARRY, WARD, JJ., and HUFFT, J. Pro Tem.
BARRY, Judge.
Charles Harris was an employee of Fluor Constructors, Inc., a subcontractor, and worked at Tenneco's plant in Chalmette. Fluor Engineers, Inc., general contractor, had a contract with Tenneco to perform start-up activities for a fluid catalytic cracking unit. Fluor (both entities are referred to as Fluor) completed its job and turned the unit over to Tenneco but was performing "punch list" duties.
Tenneco contracted with Lou-Con, Inc. to set up a flushing operation to ready the unit for start-up. Lou-Con hooked up material supplied by Tenneco and water was pumped through the hose which pulled away from the pipe. Harris was nearby in his "print shack" and was hit by the water or hose and knocked to the ground.
Harris sued Tenneco, Lou-Con, and C.V. Harold Rubber Co., the pipe and hose supplier, and their insurers. Lou-Con filed a third party demand on Tenneco and C.V. Harold. Hartford Accident & Indemnity Co. filed an intervention for reimbursement of compensation benefits paid to Harris. Tenneco filed a third party demand for contractual indemnity from Fluor Engineers, Inc. and Hartford Insurance Co., Fluor's insurer.
*319 Judgment was rendered (in pertinent part) as follows:
IT IS ORDERED, ADJUDGED AND DECREED there be judgment in favor of plaintiff, CHARLES R. HARRIS, and against defendant, TENNECO OIL COMPANY, in the sum of THREE HUNDRED NINETY SIX THOUSAND, SIX HUNDRED NINETY AND NO/100 ($396,690.00) DOLLARS, together with legal interest thereon from date of judicial demand until paid and for all costs of these proceedings.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED there be judgment in favor of Intervenor, HARTFORD INSURANCE COMPANY, and against defendant, TENNECO OIL COMPANY, in the sum of SIXTY SIX THOUSAND, NINE HUNDRED SEVENTY FIVE AND NO/100 ($66,975.00) DOLLARS, plus any amounts in compensation benefits paid Charles R. Harris since October 25, 1988, and this judgment is a first lien and privilege on the judgment herein granted to Charles R. Harris and shall be paid in preference and priority over all persons whomsoever.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED there be judgment in favor of defendants, C.V. HAROLD RUBBER COMPANY, AND LOU-CON INC., and against plaintiff, CHARLES R. HARRIS, dismissing his suit at his costs.
IT IS FURTHER ORDERED, ADJUDGED AND DECREED there be judgment in favor of Third Party Defendant, FLUOR ENGINERS [sic], INC., and against Third Party Plaintiff, TENNECO OIL COMPANY, dismissing its third party demand at its costs.
The trial court's clear, comprehensive reasons follow:
The main issue in these proceedings is which defendant or defendants, if any, caused damage to the plaintiff. The conclusion of this Court is that Tenneco Oil Company is the only tort feasor.
There is absolutely no evidence against Fluor Engineers, Inc. Neither plaintiff nor Tenneco Oil Co. has carried their burden as to C.V. Harold Rubber Company, Inc., and the court is of the firm opinion that C.V. Harold Rubber Company, Inc. did not furnish the 6 inch30-50 foot hose that slipped from the sleeve attached to the 36 inch line being flushed.
There is no evidence of negligence or any form of possession or `garde' of the offending hose by the third party defendant, Lou-Con Inc. Accordingly, contractual issues need not be addressed.
This is a simple issue made complicated by multiple pleadings. The essential facts are that the plaintiff, Charles Harris was an employee of Fluor Constructors, a subcontractor of Flour [sic] Engineers, Inc. Fluor Engineers, Inc. contracted with Tenneco Oil Company to build improvements and/or additions to its refinery at Chalmette, La.
Some time prior to the incident under consideration Fluor Engineers, Inc. had turned over to Tenneco Oil Company and Tenneco Oil Company had accepted certain improvements including the rack of pipes in the area where plaintiff was injured. Tenneco Oil Company was attempting to flush possible construction debris from a 36 inch pipe line by the use of water pressure. In order to accomplish this, Tenneco Oil Company had filled a large vessel known as the `sox scrubber' with water that had been previously used in their boilers. The reservoir of water in the sox scrubber was used to apply gravity pressure to a pipe going to a manifold on the ground and from the manifold to a 6 inch30-50 foot length of rubber hose to the 36 inch line which was located some 15 or more feet above the ground. The hose was fitted with nipples on each end and the outer edge of the nipples were fitted with a flange. The hose was bound to the nipples by clamps (neither fitted by Lou-Con or C.V. Harold). One flange was attached to the discharge end of the manifold and the other was attached to a 6 inch inlet into the 36 inch line.
Tenneco Oil Company, through one of its superintendents, Alfred McCrea, was *320 in charge of the flushing operation. Mr. McCrea assigned one of his leadermen,[1] James W. White, to have employees of Lou-Con, Inc. hook up the 6 inch30-50 foot hose as required. Mr. White contacted John Heard, a foreman for Lou-Con, Inc., and instructed him to have one of his men make the hook up. Mr. Heard and the Lou-Con Inc. employee did exactly as instructed. After the line was completed, the Tenneco people taped off the area and workmen were ordered to open the valve coming from the sox scrubber. The water came down from the sox scrubber to the manifold into the 6 inch rubber hose, up to the connected 36 inch pipe. The 6 inch30-50 foot hose came loose from the sleeve flange some 15 or more feet above the ground, whipped around and spewed water around the area and continued to do so until the water supply was secured.
Plaintiff, Charles Harris, a foreman for Fluor Constructors, was facing his desk in a construction field shack under the pipe rack approximately 20 feet away from the connection to the 36 inch pipe which was outside the taped danger area. The water and/or hose and/or both struck Mr. Harris in the back and threw him up and over his desk onto the ground at the back part of the shack.
It is admitted by Tenneco Oil Company employees that the flushing operation was `a Tenneco operation' under the control and supervision of Tenneco. It is admitted that the offending hose was owned by Tenneco. There is no evidence as to who fitted the flange nipples and strapping to the hose. Tenneco Oil Company insists that the hose was purchased from C.V. Harold Rubber Company, Inc. and in this endeavor Tenneco was joined by the plaintiff.
Tenneco could not produce the purchase order or any other evidence of purchasing this hose from C.V. Harold Rubber Company, Inc., except for the testimony of Mr. McCrea stating that he ordered the hose two weeks prior from Chester at C.V. Harold Rubber Company, Inc., and that the invoice or purchase order was lost or thrown away after normal operations were resumed as he did not know that anyone was injured.
C.V. Harold Rubber Company, Inc. through its vice president, Mr. George Talbot, testified that C.V. Harold Rubber Company, Inc. keeps all of its purchase orders and invoices in two sets of files, one for accounting and one for sales, for a period of five years, and that an exhaustive search was made to locate orders for 6" water hose, and that the only 6" water hose sold to Tenneco Oil Company during the year 1984 was a 6 inch × 68 inch hose. They did sell other 6 inch hoses to Tenneco Oil Company during 1984 but they were oil suction and discharge hoses for the Marine Division at Riverside. Further, that every delivery by C.V. Harold Rubber Company, Inc. was made directly to Tenneco's receiving department and not to any unit in the field.
This testimony is buttressed by the testimony of Mr. Chester Kuylen, a salesman for C.V. Harold Rubber Company, Inc. who handles the Tenneco account. Mr. Kuylen produced his daily note book records in which every phone call and request for hose information and sales is recorded, and explained his procedure. He confirmed the testimony of Mr. Talbot that the only 6 inch water hose that was made up by C.V. Harold Rubber Company, Inc. was one 6" × 68" hose.
Tenneco Oil Company, having produced the offending hose, having had it connected under its supervision, and having the `garde' of said hose, is responsible for the connections (straps) thereon and is presumed to know the defects, if any, in its own equipment. Therefore, Tenneco Oil Company is the only defendant liable to the Plaintiff. The Court assesses Tenneco Oil Company's fault at 100% *321 and finds the plaintiff free of any negligence.
The plaintiff, Charles Harris, muddy and wet, started to the First Aid Trailer but decided that he should go home, take a bath and change clothes, and return for treatment. He did this and reported to the First Aid Trailer each day until he and his men were laid off the job. On occasions, during the following week, he continued to inform of his problems and complaints to the First Aid personnel. After lay-off, he was advised to consult his own physician.
The plaintiff consulted Dr. George M. Byram who had treated him on previous occasions. On November 21, 1984, Dr. Byram took a history, ordered x-rays and rendered medical treatment and advice. Mr. Harris advised Dr. Byram that all of his complaints had subsided except for his back and right leg. After examining the x-rays, etc., and meeting with the plaintiff on December 4, 1984, the doctor ordered bed rest. On December 14, he ordered physical therapy and fitted plaintiff with a tens unit. Dr. Byram continued to treat plaintiff until June 16, 1987.
During this period he had obtained C. T. Scans and Mileograms [sic] which revealed a large bulging disk at L4-5 and S1 and suggested that Mr. Harris consider surgery. One [sic] June 16, 1987, Dr. Byram again recommended surgery which Mr. Harris accepted and a laminectomy was performed on June 17, 1987 and plaintiff was discharged on June 26, 1987. The surgery procedure seems to have eliminated the right leg pain but has not totally eliminated the back pain. Dr. Byram assesses a permanent disability of 25% of the body.
Mr. Harris was 59 years of age at the time of the accident. He was in good health and physical condition, and without any prior back problems.
The accident necessitated a lumbar decompression laminectomy, with a total laminectomy of the L-4 level, and a foraminotomy at the L-4/5 level, bilaterally, in June, 1987. His post surgical recovery was complicated when he suffered intractable hiccoughs for four days.
The court finds Mr. Harris to be permanently disabled from his former occupation, or any type manual work, he cannot lift over ten pounds or perform any job that requires frequent or repetitive stooping, bending, standing or sitting. He has a 25% functional impairment of his total body.
Dr. George Byram testified that the plaintiff could have worked for an indeterminate period of time if this accident had not occurred. Harris testified that he never contemplated retirement, and would have worked beyond age 65. He suffers with back pain every day and has difficulty sleeping every night because of his discomfort. He takes pain medication daily and uses a tens unit, back brace and orthopedic back cushion regularly.
Given his present age of 63, and the nature of injuries, it is doubtful that Mr. Harris will ever maintain regular, permanent employment. Accordingly, damages will be assessed as follows:

Past Medical Expenses $ 66,975.00
Future Medical Expenses 20,000.00
Loss [sic] Earnings until
 date of trial 93,902.00
Diminished Earning Capacity 85,813.00
Pain & Suffering, both
 physical and mental, permanent
 disability and disminished
 [sic] quality of
 life 130,000.00
 ___________
 TOTAL $396,690.00

Tenneco appeals with the following specifications:
1. The District Judge erred by finding Tenneco "the only tortfeasor."
2. The District Judge erred by finding plaintiff totally disabled. Fluor and Lou-Con adopt Tenneco's argument.
3. The District Judge erred in the calculations of past and future wage loss. Fluor and Lou-Con adopt Tenneco's argument.
4. The District Judge erred by awarding future medical expenses. Fluor and Lou-Con adopt Tenneco's argument.

*322 5. The District Judge erred by failing to award indemnity and defense costs to Tenneco.
6. The District Judge erred by ruling in favor of Intervenor Hartford Insurance Company and against Tenneco Oil Company.
Harris answered the appeal. He urges past and future wages should be increased and argues that if Hartford's intervention is incorrect it should inure to his benefit.
Alternatively, Harris claims there should be a remand to assess attorney's fees and costs from Hartford. That issue is pretermitted due to our disposition of the intervention.

TENNECO SPECIFICATION 1
Tenneco contends it was not solely responsible for the accident. Tenneco and Fluor had a contract to indemnify each other for liability due to their respective employees "but excluding injuries, illnesses or death finally determined in a court of law to have been caused solely by the other's negligence." Tenneco's argument is that John Heard, a Lou-Con employee, stated to a Tenneco employee that the banding on the hose hookup was insufficient and therefore Lou-Con was partially at fault by failing to prevent plaintiff's injury.
A court of appeal may not set aside the trier of fact's finding unless it is manifestly erroneous or clearly wrong. When testimony conflicts, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989).
Heard, Lou-Con's supervisor in charge of setting up the flushing operation, was not employed by Lou-Con at the time of trial. He testified Tenneco furnished Lou-Con with the materials that were used. White, McCrea, and others instructed Lou-Con on what to hook up, the lines to be flushed, and all other aspects of the operation. Heard said he questioned the hose banding's ability to withstand the pump's pressure but was told by White, a "leaderman", that Tenneco had handled the same operation before. Heard said McCrea, the maintenance supervisor, told him that Tenneco used the same type of hose before. Heard testified that he asked no further questions because "I couldn't dispute Tenneco. I wasn't in a position to."
Heard said when they finished bolting the hose they transferred the flushing operation to Tenneco and he moved his workers away to watch. He noted that the area where Harris was injured was not roped off. Heard stated he knew the print shack was north of the flushing operation but he did not know Harris was inside. White and McCrea denied that Heard said he believed the hose would not hold.
The trial court apparently felt that Heard discharged any duty he owed to Harris. Heard's testimony provides ample support for the trial court to conclude that Tenneco was the only tortfeasor.

TENNECO SPECIFICATION 5
Tenneco argues that the trial court judgment is based on strict liability (not negligence) and Tenneco should receive indemnity because strict liability is not specifically excluded in the contract.
Tenneco's argument is not based on the facts but on its interpretation of the reasons for judgment. We disagree with that interpretation.
The trial judge carefully specified that there was no negligence on the part of any other party. In the first paragraph the court says "[t]hat Tenneco Oil Company is the only tort feasor." On the third page the court "assesses Tenneco Oil Company's fault at 100% and finds the plaintiff free of any negligence." Remarks about the "garde" of the hose and it "is presumed" that Tenneco knows of "the defects, if any, in its own equipment" do not change the fact that the trial court found Tenneco was negligent and the sole cause of Harris' injuries.

TENNECO SPECIFICATION 2
Tenneco argues that Harris is not totally disabled.
The trial court stated:

*323 Given his present age of 63, and the nature of injuries, it is doubtful that Mr. Harris will ever maintain regular permanent employment.
Dr. George Byram, orthopedic expert, testified that Harris has a 25% disability of his body. Harris' range of motion is restricted, he is permanently disabled as a pipe fitter and from manual labor including lifting greater than ten pounds, frequent stooping and bending, and long sitting or standing periods. Dr. Byram stated that Harris' back was weak from surgery and when Harris has a flare-up it requires bed rest for a few days. He also stated Harris could not perform any job which required sitting for long periods. Dr. Byram particularly noted that Harris has reached a plateau of recovery and there are periods when he is disabled from "virtually any job."
Dr. Byram's testimony provides sufficient support for a finding that Harris is totally disabled. However, the figure arrived at by the trial court for diminished earning capacity, $85,813.00, corresponds with an amount calculated by Harris' expert economist after deducting minimum wage earnings.
That deduction for minimum wage earnings suggests the trial court did not find Harris totally disabled. Rather, it appears the court concluded Harris was capable of some fulltime employment.

TENNECO SPECIFICATION 3

A.
Tenneco argues that the trial court did not accept its expert's opinion on how to compute past and future lost wages. Harris answers that his expert's opinion on how to compute the wage loss should be used.
Loss of earning capacity, not just pecuniary loss, is the proper basis for assessing loss of past income. Folse v. Fakouri, 371 So.2d 1120 (La.1979). Likewise, loss of future income is assessed based on loss of future earning capacity. Perkins v. Ricks, 514 So.2d 180 (La.App. 4th Cir.1987), writ denied 519 So.2d 117 (La.1988); Brooks v. Chicola, 514 So.2d 7, FN 2 (La.1987). Earning capacity at the time of injury is relevant, but not necessarily determinative of future ability. Folse, supra.
Expert economic testimony, the plaintiff's physical condition before the accident, his work record, the amount earned in previous years and the probability of earning similar wages for the remainder of his work life are some of the factors to be considered in determining future earning capacity. Garrett v. Celino, 489 So.2d 335 (La.App. 4th Cir.1986).
Pursuant to La.C.C. Art. 1999, much discretion is left to the trial court in assessing damages when they are not susceptible of precise measurement.
A finding as to the measure of damages will not be disturbed on appeal unless the fact finder abused its much discretion. Scott v. Hospital Service Dist. No. 1 of the Parish of St. Charles, 496 So.2d 270, 274 FN 11 (La.1986).
At trial Harris contended there were periods during the four years prior to the accident when he chose not to work in order to assist his son, and his wages do not reflect his earning capacity. Therefore the computation of past and future earning losses was seriously contested.
Philip Jeffress, Harris' expert economist, used actual earnings for the year of the accident (when wages were substantially higher than in immediate preceding years) annualized to reflect the fact that he only worked ten and one-half months of that year (shortly after the accident he was laid off). Jeffress stated that an annualized wage was the most appropriate figure to use.
Kenneth Boudreaux, defense economics expert, suggested two different base wages. Because Harris' annual wages for four years prior to the accident fluctuated substantially, Boudreaux first testified the base wage should be taken from the average of the actual wages for those four years. Boudreaux next suggested another base wage using the four year average, but reduced by fifteen percent. Boudreaux justified the alternative measure on the conclusion that the demand for Harris' *324 work (pipe fitter) was lower at the time of trial and would continue to be lower.
It was also disputed:
1. Whether unemployment compensation during the four years prior to the accident should be deducted from the base wage calculations by the defendant's economic expert.
2. Whether Harris was totally disabled.
3. How much should be deducted from any future loss of earnings award if Harris was not totally disabled. The defense expert gave a range from minimum wage to $5.00 per hour.
4. Whether future loss of earnings should be computed without reflecting any future increases or using a 3% net of present value discount or using the average increases in wages over the four years prior to the accident.
5. What Harris' work life expectancy should be.
6. Whether pipe fitting jobs continued to be available to Harris who testified that he would go wherever in order to work.
Jeffress' testimony on past lost wages indicated that, depending on variables, the most appropriate figure was $118,656.00. Boudreaux testified $67,877 would be appropriate.
As to diminished earning capacity,[2] Jeffress testified that $148,211 was appropriate, whereas Boudreaux testified that $14,162.34 to $37,439.96 was proper.
The trial court awarded $93,902 for loss of earnings and $85,813 for diminished earning capacity. Subject to our discussion and amendment in Part B regarding gross wages, those figures are well within the range of the experts' estimates and within the trial court's much discretion.

B.
Regarding past and future wage loss, Harris also argues that income taxes should not have been deducted. Harris objected when his expert economist was cross examined about the impact income tax liability would have on the figures he used. Harris urged gross rather than net income was the proper measure. The court stated:
No, I disagree. I think it's the law of this Circuit is [sic], to my recollection, is to use net.
The court then allowed both experts to answer questions regarding Harris' net wages. The figure awarded by the trial court for diminished earning capacity corresponds with one of the amounts calculated by plaintiff's expert economist after deducting income tax liability. It is not clear how the trial court determined the award for loss of earnings to date of trial, so we have nothing suggesting whether income tax liability was deducted from the award for loss of earnings to date of trial except for the above noted statement by the trial court.
In Martinez v. U.S. Fidelity and Guar. Co., 423 So.2d 1088 (La.1982) the Supreme Court stated it had never considered whether income taxes may be considered in formulating damage awards. The court declined to consider the issue.[3]
The Supreme Court also noted that our circuits were split on that issue. Our review of the current jurisprudence indicates three circuits use gross rather than net earnings. Schwamb v. Delta Air Lines, Inc., 516 So.2d 452 (La.App. 1st Cir. 1987), writ denied 520 So.2d 750 (La.1988) (determination of damages for lost earnings was to be calculated based on gross earnings rather than net earnings); LeBleu v. Dynamic Indus. Constructors, Inc., 526 So.2d 1184 (La.App. 3rd Cir.1988), writ denied 528 So.2d 154 (La.1988) ("The proper method to compute loss of earnings is by using gross income rather than net income.") and Riley v. Winn-Dixie Louisiana, Inc., 489 So.2d 931 (La.App. 5th Cir. 1986), writ denied 494 So.2d 329 (La.1986).
The Second Circuit takes a more flexible position. In Green v. Farmers Ins. Co., *325 412 So.2d 1136 (La.App. 2d Cir.1982) the Court stated: "There is no `right' formula.... While net wages are sometimes used, the use of gross income is also appropriate."
This Circuit's position has not been clearly delineated. In Edwards v. Sims, 294 So.2d 611 (La.App. 4th Cir.1974) this Court stated:
The fact that damages resulting from personal injuries are not subject to income taxation (26 U.S.C. § 104)[4] is interrelated with the question of whether the previous earnings factors should be based on wages before or wages after taxes. Any consideration of damages for loss of wages (past or future) should be based on net income after taxes, since a plaintiff's gross earnings before taxes are never truly available to him.

294 So.2d at 616-17 (emphasis added) (footnote omitted) (footnote added).
In Morgan v. Liberty Mutual Ins. Co., 323 So.2d 855 (La.App. 4th Cir.1975), writs dismissed 325 So.2d 282 (La.1976) this Court cited Edwards while nonetheless stating that since tax liability varies and may be altered with changing circumstances, in some cases it may be more appropriate to use a figure near gross income. The Court concluded that plaintiff's future tax liability would not be comparable to that paid previously because his circumstances had been radically altered. The Court reasoned:
While the damages he is awarded are not taxable, the income derived from their investment is. In all probability his medical expenses will create a deduction sufficient to relieve him of any tax liability.[5]
323 So.2d at 862 (footnote added).
The Court did not discuss Morgan's obvious departure from Edwards.
In Roundtree v. Technical Welding and Fabrication Co., Inc., 364 So.2d 1325 (La. App. 4th Cir.1978), writ denied 367 So.2d 389 (La.1979), this Court rejected the defendant's contention that future income tax liability should be deducted from the award made for loss of the decedent's support. The Court noted that as to future tax liability, "Doctor Wolfson testified that it is difficult to project, with any certainty, what the tax rate will be 29.2 years into the future." The Court then cited Morgan for the proposition that "courts have the option of using gross income in awarding loss of future wages."
In Morgan and Roundtree there appear to have been circumstances which persuaded this Court that no reduction of damages should be made to reflect tax liability. In Morgan the Court essentially concluded that net and gross incomes were equivalent since the plaintiff would not owe income tax due to medical deductions. In Roundtree the expert declined to testify as to the tax liability over the 29.2 years the decedent presumably would work. This suggests an inability to present competent evidence sufficient to support tax liability reductions in the damage awards, possibly because of the length of time involved.
In Wright v. Ocean Drilling & Exploration Co., 444 So.2d 129 (La.App. 4th Cir. 1983), writs dismissed 445 So.2d 431, 432 (La.1984), a Jones Act suit, this Court found merit in the defendant's contention that the past wage loss award should have been based on net rather than gross income. Thus, the Court reduced the award to reflect net pay. However, this reduction was based on the Court's assessment of the governing federal rule under the Jones Act pursuant to Varlack v. SWC Caribbean, *326 Inc., 550 F.2d 171 (3rd Cir.1977).[6]Wright does not cite earlier jurisprudence and we do not believe it changes this Circuit's position on the issue of tax liability in personal injury suits.
The basis for the use of net wages in formulating a base figure for wage losses is 26 U.S.C. § 104 which exempts damages for personal injuries or sickness from federal income tax liability.[7] The reasoning behind this rule is that earnings "before taxes are never truly available" to a plaintiff. Edwards v. Sims, supra. Nonetheless, we are aware there are countervailing considerations including 1) that future tax rates are uncertain and the manner in which a particular plaintiff may be affected by them is speculative and 2) that a tortfeasor should not benefit from an advantage accruing from a collateral source. Reeves v. La. and Ark. Rwy. Co., 304 So.2d 370 (La.App. 3rd Cir.1974), writ denied 305 So.2d 123 (La.1974). See also footnote 7, infra for considerations which further complicate this matter.
We are satisfied that the more equitable rule is to use gross wages. Thus, Edwards, Morgan and Roundtree are overruled insofar as each case requires using net wages.[8]
The gross wage is $99,783 which corresponds to the award for diminished earning capacity. This represents an additional $13,970 to be added to the judgment.
As noted previously, we cannot determine how the trial court arrived at the award for lost earnings. The award is $24,854 less than the $118,756 testified to using the same base wage as that apparently used in computing diminished earning capacity. It is clear the trial court believed it was required to reduce the award for tax liability and because this was done in setting the award for diminished earning capacity, we necessarily assume the amount for lost earnings to the date of trial was also reduced.
There is no testimony as to the tax rate used by the experts but we note that 14% was applied to the diminished earning capacity award which is only approximately $8,000 less than that actually awarded for loss of earnings to the date of trial. That is a reasonable rate (under these circumstances) to compute Harris' gross loss of earnings.
Thus, we compute Harris' gross loss of earnings to the date of trial as $109,188.37 which adds $15,286.37 to the award.

TENNECO SPECIFICATION 4
Tenneco argues that the trial court erred by awarding $20,000 for future medical expenses because there is no evidence to support the award. We agree.
*327 Future medical expenses must be established with some degree of certainty and the plaintiff must show that the expenses more probably than not will be incurred. Boothe v. New Orleans Public Service, Inc., 447 So.2d 620 (La.App. 4th Cir.1984).
There was no expert testimony as to future medical expenses. Harris testified that daily he has mild pain and a great deal of the time he has severe pain, especially at night. He has a prescription for Fiorinal but doesn't like it because it gives a bad feeling and leaves residual pain. He claims he sleeps poorly if he does take Fiorinal and he limits its usage to two to three times a week. He also takes Advil daily and sometimes wears a TENS unit which causes skin irritation. He uses a brace and sits on a pad. He was told by Dr. Byram to return in six months.
Harris' very limited testimony does not refer to costs and is insufficient to support any award for future medical expenses.
The award for damages must be reduced by the $20,000 awarded for future medical expenses.

TENNECO SPECIFICATION 6
Tenneco urges that it should not be required to reimburse intervenor Hartford for compensation benefits paid to Harris. Tenneco relies on provisions in its contract with Fluor which provide that subrogation is waived. Harris urges that if Hartford is not entitled to reimbursement, that should inure to his benefit and not Tenneco's. Hartford did not file a brief.
Under the contract Fluor is obligated to carry certain types of workmen's compensation and comprehensive liability insurance. The contract also provided that:
All policies shall contain provisions that underwriters will have no right of subrogation against Owner or Fluor, as the case may be, it being the intent of the parties that the insurance so effected shall protect both parties and be primarily liable for any and all losses covered by the above-described insurance.
Hartford provided Fluor with workmen's compensation insurance. By endorsement to the policy, Hartford waived any right of subrogation with respect to any person or organization to whom Fluor was required by written contract before loss to obtain such a waiver. Tenneco thus urges that the waiver of the subrogation precludes Hartford from a judgment of reimbursement against Tenneco.
While there is no Louisiana case on point, the federal Fifth Circuit has concluded that where a workmen's compensation carrier waived subrogation as to a third party, the carrier waived any claim to the settlement between the third party and the employee. Capps v. Humble Oil & Refining Co., 536 F.2d 80 (5th Cir.1976); Allen v. Texaco, Inc., 510 F.2d 977 (5th Cir.1975). Contra LeBlanc v. Petco, Inc., 647 F.2d 617 (5th Cir.1981), cert. denied 454 U.S. 1085, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981).[9]
Hartford could not have sued Tenneco for reimbursement due to the subrogation waiver. Allowing reimbursement against Tenneco in favor of Hartford out of the damages awarded to Harris would allow Hartford to do indirectly what it could not do directly.
We agree with Allen and Capps. Hartford is not entitled to a judgment against Tenneco and that does inure to Harris' benefit. Hartford is not entitled to a lien or privilege on Harris' award.
The judgment in favor of Hartford is reversed.

DECREE
The judgment in favor of Charles R. Harris and against Tenneco Oil Company as to future medical expenses is reduced $20,000. *328 The judgment is increased by $29,256.37 to reflect gross wages.
The judgment of the district court in favor of intervenor Hartford Insurance Company is reversed.
The judgment in favor of Harris and against Tenneco is amended to read as follows:
It is ORDERED, ADJUDGED AND DECREED that there be judgment in favor of plaintiff, Charles R. Harris, and against the defendant, Tenneco Oil Company, in the sum of Four Hundred Five, Nine Hundred Forty-Six and 37/100 ($405,946.37) DOLLARS, together with legal interest thereon from the date of judicial demand until paid, and for all costs of these proceedings.
In all other respects the judgment is affirmed.
REVERSED IN PART; AMENDED; otherwise AFFIRMED.
NOTES
[1] McCrea, a maintenance supervisor for Tenneco, testified that "leadermen" were temporary supervisors from "the yard" who were assigned to oversee a particular job. In this instance the "leaderman" would tell Lou-Con what to do.
[2] Though not specifically designated, this is apparently for future loss of earnings.
[3] The court stated "[t]he parties in this case have not argued the merits of this question, however, and we decline to consider this important issue on the record and briefs before us, since we have found that in the context of this case it is unnecessary for us to do so."
[4] 26 U.S.C. § 104 provides in pertinent part:

(a) In general.Except in the case of amounts attributable to (and not in excess of) deductions allowed under section 213 (relating to medical, etc., expenses) for any prior taxable year, gross income does not include
* * * * * *
(2) the amount of any damages received (whether by suit or agreement and whether as lump sums or as periodic payments) on account of personal injuries or sickness;
* * * * * *
[5] It is not clear from Morgan whether there was evidence regarding the deductability of plaintiff's medical expenses or whether the Court was taking advantage of its own knowledge of federal tax law.
[6] A recent decision in the Eastern District of Louisiana, Turner v. Inland Tugs Co., 689 F.Supp. 612 (E.D.La.1988) may raise the question whether Varlack is the prevailing federal rule in this jurisdiction.
[7] The Internal Revenue Service has recently reaffirmed the exclusion from income of damages representing lost wages in the context of a physical injury. Morgan, "Old Torts, New Torts and Taxes: The Still Uncertain Scope of Section 104(a)(2)", 48 La.L.Rev. 875, 877 FN 8 (1988). We note that the concept of tort liability for injuries without any underlying physical injury has recently expanded in Louisiana. LeJeune v. Rayne Branch Hospital, 556 So.2d 559 (La.1990). The exclusion from income taxation of damages based on lost earnings or otherwise taxable income without any underlying physical injury has been denied, though this has been criticized. See Morgan, at 877. It should also be noted that there is some question whether certain types of litigation fall under that statute. See id. at 876, in particular FN3 and accompanying text and Thompson v. C.I.R., 89 T.C. 619 (1987) (back pay awarded in sex discrimination suit was not excludable from taxable income under § 104(a)(2)), reversal of other issues, 864 F.2d 1128 (4th Cir.1989).
[8] In accordance with the internal rules of the Court the proposal to overrule our previous decisions insofar as they require the use of net wages was referred to the Court en banc. All judges (Chief Judge Patrick M. Schott, Judge Jim Garrison, Judge Denis A. Barry, Judge Robert J. Klees, Judge William H. Byrnes, III, Judge Philip C. Ciaccio, Judge Robert L. Lobrano, Judge Charles R. Ward, Judge David R.M. Williams, Judge Joan Bernard Armstrong, Judge Steven R. Plotkin and Judge Rudolph F. Becker, III) voted to overrule the prior jurisprudence of this Court. Judge Williams would follow the Second Circuit as set forth in Green v. Farmers Insurance Company, 412 So.2d 1136 (La.App. 2d Cir.1982).
[9] This case reversed LeBlanc v. Petroleum Equipment Tools Co., 489 F.Supp. 488 (W.D.La. 1980) which relied on Allen. The district court had concluded that since the compensation carrier had waived subrogation against a third party tortfeasor, the carrier had lost its entitlement to any of the proceeds of the settlement with the third party. In reversing the district court, the federal Fifth Circuit did not mention Allen or Capps, though the dissent cited both cases. Both Allen and Capps were out of United States district court for the eastern district of Louisiana.